UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------------X
KRYSTIN HERNANDEZ, NATALIE BAKER, ETHAN
CHIEL, KYLA RASKIN, REX SANTUS, ROXANNE
ZECH, RAFAEL-LEV GILBERT, SARAH MILLS-
DIRLAM, AUGUST LEINBACH, JALEN MATNEY,
JONATHAN DAVIS, and DAVID HOLTON,

        Plaintiffs,

  -against-           **COMPLAINT**

                **Index No.**
THE CITY OF NEW YORK; NEW YORK CITY MAYOR
BILL DE BLASIO; NEW YORK POLICE DEPARTMENT
("NYPD") COMMISSIONER DERMOT SHEA; NYPD
CHIEF OF DEPARTMENT TERENCE MONAHAN; NYPD
DEPUTY COMMISSIONER FOR LEGAL MATTERS
ERNEST F. HART; NYPD ASSISTANT CHIEF KENNETH
LEHR; NYPD LEGAL BUREAU SERGEANT KENNETH
RICE; NYPD STRATEGIC RESPONSE GROUP ("SRG")
MEMBER FIRST NAME UNKNOWN ("FNU") RABEL;
NYPD SUPERVISOR FNU HYLAND; and NYPD
MEMBERS JOHN AND JANE DOES 1-157,

        Defendants.

------------------------------------------------------------------------------X

   Plaintiffs KRYSTIN HERNANDEZ, NATALIE BAKER, ETHAN CHIEL, KYLA

RASKIN, REX SANTUS, ROXANNE ZECH, RAFAEL-LEV GILBERT, SARAH MILLS-

DIRLAM, AUGUST LEINBACH, JALEN MATNEY, JONATHAN DAVIS, and DAVID

HOLTON, by their attorneys, Gideon Orion Oliver and COHEN&GREEN P.L.L.C., hereby

complain of Defendants as follows:

<u>**PRELIMINARY STATEMENT**</u>

   1.  On May 25, 2020, police in Minneapolis, MN, murdered George Floyd. Almost

immediately, mass protests against police violence and in support of police accountability began

nationwide. These protests, including those organized by those in the Black Lives Matter

movement and others, spread across the United States and the world, including here in New York City where thousands exercised their constitutional rights to protest. Those protests were met with a prolonged crackdown in response from the New York City Police Department ("NYPD").

2.      On June 4, 2020, after days of sustained protests and brutal NYPD response, NYPD members planned and executed a violent attack on a "FTP4"[1] protest in the Mott Haven area of the Bronx, (the "FTP4 Protest" or the "Mott Haven Protest").

3.      On June 4, 2020, each Plaintiff was acting as a volunteer Legal Observer for the National Lawyers Guild ("NLG") – New York City Chapter ("NLG-NYC") when they were targeted because of, or in spite of, their status as a NLG-NYC Legal Observer to be grabbed and handcuffed, often violently, by NYPD members at the FTP4 Protest.

4.      Prior to the June 4, 2020 FTP4 Protest, Defendants NYPD Commissioner Dermot Shea, NYPD Chief of Department Terence Monahan, NYPD Assistant Chief Kenneth Lehr, and other NYPD members and representatives of Defendant City who were involved in planning the police response to the FTP4 Protest knew that protesters planned to gather at The Hub at 149th Street and 3rd Avenue in the Bronx and march through the Mott Haven streets participating in the protest. Rather than planning to escort and facilitate the FTP4 Protest, those Defendants devised, and Defendants Monahan, Lehr, NYPD Legal Bureau Attorney Kenneth Rice, and other NYPD members (including other Defendants) under their command executed, a brutal trap for and violent assault on the FTP4 protesters. For example, upon information and belief, Defendants Monahan and Lehr, along with other high-level NYPD policymakers who were involved in the

---

[1] "FTP" stands for many things, including "Free the People," "Feed the People," and, in the context of certain anti-police protests, "Fuck the Police."

police response to the FTP4 Protest, planned to utilize police resources including NYPD

Strategic Response Group ("SRG") members in riot gear, some of whom were on bicycles, to

trap, then physically brutalize and arrest, FTP4 Protest attendees, without first having given them

notice or an opportunity to disperse - let alone a meaningful one.

5.      Upon information and belief, the Defendant City officials who were involved in

deciding how the NYPD would responds to the FTP4 Protest devised, and other NYPD members

(including other Defendants) executed, that brutal assault based on the "anti-police rhetoric" of

the FTP4 protesters. For example, at a press conference shortly before the FTP4 Protest on June

4, 2020, Defendant Shea said that the "anti-police rhetoric disgusts me to my core."[2] Then, over

the course of the next several hours after that, as described more fully below, NYPD members -

including the other individual Defendants – under the command and supervision of Defendants

Monahan and Lehr, among other NYPD supervisors, trapped, brutalized, and arrested FTP4

Protest participants as well as bystanders and witnesses, including Plaintiffs.

6.      With an 8:00 p.m. curfew - requiring orders to disperse and opportunities to

comply with them before any enforcement action could be taken - in place, at around 7:45 p.m.,

NYPD members kettled and trapped Plaintiffs and other protesters with lines of police blocking

any possible escape. The NYPD then played nominal orders to disperse for show, but refused to

allow them to leave — even as they chanted "let us go." At around 8:00 p.m., the police then

began a brutal physical assault on the protesters, beating them with fists, batons, and bicycles,

deploying pepper spray, and employing similar violence.

7.      Past there, the NYPD engaged in long-standing, unconstitutional arrest processing

tactics, ranging from wildly overtight handcuffs, to refusing to release protesters with

---

[2] https://twitter.com/NYPDnews/status/1268660244323983361

3

summonses on the street in order to deter further protesting. For example, NYPD members physically restrained hundreds of FTP4 Protest arrestees with flex-cuffs in a way that caused them unnecessary pain and suffering and, in some cases, injuries, including serious and long-term nerve damage — and refused to remove obviously overtight cuffs, or were unable to because they were not issued the proper equipment. Then, rather than releasing other arrestees from the street as the New York State Criminal Procedure Law § 150.20, NYPD members subjected them to lengthy and unnecessary custodial arrest processing and detention that confined them in dangerously close quarters for hours, all at the height of the global COVID-19 pandemic.

8.      The morning after the Mott Haven Protest, Defendant Shea ratified the misconduct that occurred in the NYPD's assault on the FTP4 Protest when he said the NYPD "had a plan which was executed nearly flawlessly in the Bronx." [3]

9.      Similarly, Defendant de Blasio ratified the misconduct that occurred in the NYPD's assault on the FTP4 Protest when he said that "what happened in Mott Haven…is something that the NYPD saw coming" on June 5, 2020[4] and when he bragged on June 7, 2020 that he had "approved the broad strategies" that the NYPD deployed "and sometimes [their] very specific choices" made in terms of the police responses to the Summer 2020 Protests, including the FTP4 Protest.[5]

---

[3] Jake Offenhartz, Nick Pinto, and Gwynne Hogan, "NYPD's Ambush of Peaceful Bronx Protestors Was "Executed Nearly Flawlessly," City Leaders Agree," *Gothamist*, June 5, 2020, *available online at* https://gothamist.com/news/nypds-ambush-of-peaceful-bronx-protesters-was-executed-nearly-flawlessly-city-leaders-agree.
[4] *See* Transcript: Mayor de Blasio Holds Media Availability, June 5, 2020, *available online at* https://www1.nyc.gov/office-of-the-mayor/news/410-20/transcript-mayor-de-blasio-holds-media-availability.
[5] *See* Transcript: Mayor de Blasio Holds Media Availability, June 7, 2020, *available online at* https://www1.nyc.gov/office-of-the-mayor/news/413-20/transcript-mayor-de-blasio-holds-media-availability.

10.     Plaintiffs' experiences have been well documented and widely reported in the press, including in *Gothamist* and *The New York Law Journal* and on WNYC. Through counsel, Plaintiffs have complained about the brutal NYPD crackdown on the FTP4 Protest, and their own experiences, repeatedly in writing and, in one case, in a live exchange on *The Brian Lehrer Show: Ask the Mayor* on WNYC, to Defendants de Blasio, Shea, and Hart, among other high-level Defendant City policymaking officials. They have provided written and oral statements to the New York State Office of the Attorney General ("OAG") and the New York City Civilian Complaint Review Board ("CCRB"). Their experiences have been documented in reports by Human Rights Watch and the New York City Department of Investigation ("DOI"). The New York City Bar Association issued a strong statement condemning Plaintiffs' arrests.

11.     Yet, although Defendants de Blasio, Shea, and other high-ranking Defendant City officials have known about Defendants' uses of force against, arrests of, and other violations of Plaintiffs and Plaintiffs' rights since June 4, 2020, they have not meaningfully supervised, trained, investigated, or disciplined Defendant Rice or the other NYPD members who ordered and/or participated in using force on and arresting Plaintiffs and/or searching, seizing, or destroying certain Plaintiffs' Legal Observer notes, or taken other measures to address the violations of Plaintiffs' rights or to ensure that similar violations are not repeated in the future.

12.     Therefore, Plaintiffs now bring suit seeking money damages, attorney's fees, costs and expenses, as well as a declaratory judgment and prospective injunctive relief to prevent Defendants from violating Plaintiffs' rights, and the rights of others who wish to observe and document police activities in New York City public spaces, in the future.

## JURISDICTION AND VENUE

13.     Plaintiffs bring this action pursuant to 42 U.S.C. § 1983, the First, Fourth, and Fourteenth Amendments to the United States Constitution, and New York law.

14.     This Court has jurisdiction over Plaintiffs' federal civil rights claims herein pursuant to 28 U.S.C. §§ 1331 and 1343, and over Plaintiffs' New York law-based claims under 28 U.S.C. § 1367.

15.     The Federal Declaratory Judgment Act, 28 USC §§ 2201 and 2202, authorizes this Court to grant Plaintiffs the declaratory relief they pray for herein.

16.     Rule 65 of the Federal Rules of Civil Procedure authorizes this Court to grant Plaintiffs the injunctive relief they pray for herein.

17.     Venue is proper pursuant to 28 U.S.C. § 1391, *et seq.,* in the Southern District of New York, where several Plaintiffs reside, Defendant City of New York has offices, and the majority of the actions complained of herein occurred.

## GENERAL MUNICIPAL LAW COMPLIANCE

18.     All Plaintiffs timely served Notices of Claim on the municipal Defendant and complied with all conditions precedent to commencing an action under New York law.

19.     At least thirty days have elapsed since service of Plaintiffs' Notices of Claim and adjustment and payment thereof has been neglected or refused.

20.     Plaintiffs have initiated this action within one year and ninety days of the accrual of Plaintiffs' claims pursuant to New York State Law.

## PARTIES

21.     At all times mentioned herein, Plaintiffs Natalie Baker (Ms. Baker; she/her), Ethan Chiel (Mr. Chiel; he/him), Kyla Raskin (Ms. Raskin; she/her), Rex Santus (Mr. Santus;

he/him) and Roxanne Zech (Plaintiff Zech; they/them) were residents of Kings County in the City and State of New York.

22.     At all times mentioned herein, Plaintiffs Rafael-Lev Gilbert (Mr. Gilbert; he/him) and Sarah Mills-Dirlam (Ms. Mills-Dirlam; she/her) were residents of Bronx County in the City and State of New York.

23.      At all times mentioned herein, Plaintiffs Krystin Hernandez (Mx. Hernandez; they/them), August Leinbach (Mr. Leinbach; he/him) and Jalen Matney (Mr. Matney; he/him) were residents of New York County in the City and State of New York.

24.     At all times mentioned herein, Plaintiffs Jonathan Davis (Mr. Davis; he/him) and David Holton (Mr. Holton; he/him) were residents of Westchester County in the State of New York.

25.     At all relevant times mentioned herein, Defendant City of New York ("New York City" or "NYC") was and is a municipal corporation duly organized and existing under and by virtue of the laws of the State of New York and acts by and through its agencies, employees and agents, including, but not limited to, the NYPD and their employees.

26.     Defendant New York City Mayor BILL DE BLASIO was at all times relevant to this Complaint, and still is, the Mayor of New York City. As Mayor, Defendant de Blasio, at all relevant times, was and is an elected officer and the "chief executive officer of the city," NYC Charter Section 3, who was "responsible for the effectiveness and integrity of city government operations," NYC Charter Section 8, and had final authority to appoint and/or remove the New York City Police Commissioner, NYC Charter Section 431. He is sued individually and in his official capacity.

27.     Defendant NYPD Commissioner DERMOT SHEA was at all times relevant to this Complaint, and still is, the Police Commissioner of the NYPD. As Police Commissioner and the "head," NYC Charter Section 8, and "chief executive officer of the police force", NYC Charter Section 434, Defendant Shea, personally and/or through his authorized delegates, at all relevant times had final authority to promulgate and implement administrative and managerial policies and procedures, including policies and procedures as to personnel hiring, training, supervision, and discipline with respect to NYPD officers' performance of their duties, and constituted a City policymaker for whom the City is liable. NYC Charter Section 434. He is sued individually and in his official capacity.

28.     Defendant former NYPD Chief of Department TERENCE MONAHAN was at all times relevant to this Complaint the Chief of Department of the NYPD who has policymaking authority over the Department. At all relevant times, as Chief of Department, Defendant Monahan, had primary responsibility for NYPD operations—that is, for the police response on the street. Within the paramilitary structure of the NYPD, all NYPD uniformed members of the service were obligated to obey any lawful order given by him. Additionally, Defendant Monahan was the incident commander (meaning the highest ranking NYPD officer at the scene) at Mott Haven, and personally commanded the NYPD enforcement action at Mott Haven. He is sued individually and in his official capacity.

29.     Defendant NYPD Deputy Commissioner for Legal Matters ERNEST F. HART was at all times set forth herein the NYPD's Deputy Commissioner for Legal Matters. Upon information and belief, Defendant Hart was directly responsible for ensuring that NYPD Legal Bureau attorneys deployed in connection with the FTP4 Protest and other protests, including Defendant Kenneth Rice, were properly trained and supervised, and acted in a lawful and

constitutional manner in performing their official duties. He is sued individually and in his official capacity.

30. Defendant NYPD Assistant Chief KENNETH LEHR was at all relevant times set forth herein the Commander of Patrol Borough Bronx. Upon information and belief, Lehr was present, and directed/authorized the command, strategy tactics, and oversight, supervision, of the officers present at the Mott Haven protest and of the arrest of those individuals who participated in the Mott Haven protest, including Plaintiffs herein. All NYPD members under his command were required to follow his orders. He is sued individually and in his official capacity.

31. Defendant NYPD Legal Bureau Sergeant KENNETH RICE at all relevant times set forth herein a NYPD Legal Bureau attorney on the scene of the FTP4 Protest who was, upon information and belief, involved in planning for, deploying, and/or supervising the deployment of the Mott Haven Kettle and other acts and omissions that are the subjects of Plaintiffs' complaint. NYPD Patrol Guide § 212-20 provides that, if a NYPD Legal Bureau attorney gives advice to any NYPD member of any rank, the NYPD member "MUST FOLLOW THE DEPARTMENT ATTORNEY'S ADVICE" and warns: "Members of the service (uniformed and civilian) should be aware that in disregarding legal advice offered by Department attorneys, they may be subject to disciplinary action and civil liability."

32. At all times hereinafter mentioned, Defendants NYPD Strategic Response Group ("SRG") Officer First Name Unknown ("FNU") Rabel; Defendant NYPD Supervisor FNU Hyland; NYPD Members John and Jane Does 1-20 (the "Brook Avenue Line Does"); NYPD Members John and Jane Does 21-40 (the "Brown Place Does"); NYPD Members John and Jane Does 41-60 (the "Sidewalk Lines Does"); NYPD Supervisors John and Jane Does 61-80 (the

"NYPD Supervisor Does"); and NYPD Members John or Jane Does 81-157 were NYPD members who violated Plaintiffs' rights, as set forth and described more fully below.

33.     Defendant FNU Rabel is an Afro-Caribbean man weighing about 230 pounds and standing around 6'2" tall.

34.     Defendant FNU Hyland is a white man who was wearing an NYPD unform with a white shirt.

35.     Defendant Does 81-88 are NYPD members who participated in the arrest and assault of Mr. Santus prior to the Mott Haven Kettle.

36.     Defendant Does 89-96 are NYPD members who participated in the assault and arrest of Mr. Santus after the Mott Haven Kettle.

37.     Defendant Does 97-106 are NYPD members who participated in the assault and arrest of Mx. Hernandez.

38.     Defendant John Doe 97 was a skinny, white man who was wearing a NYPD uniform with a white shirt.

39.     Defendant Does 97-110 are NYPD members who participated in the assault and arrest of Mr. Davis.

40.     Defendant Does 111-115 are NYPD members who participated in the assault and arrest of Ms. Mills-Dirlam.

41.     Defendant Does 116-126 are NYPD members who participated in the assault and arrest of Ms. Baker.

42.     Defendant Does 127-132 are NYPD members who participated in the assault and arrest of Mr. Chiel.

43.     Defendant Doe 127 is a white, male NYPD supervisor with reddish hair, who was wearing an NYPD uniform with a blue shirt.

44.     Does 131 and 131 were, upon information and belief, wearing blue NYPD uniforms.

45.     Defendant Doe 133 is an NYPD member who participated in the assault and arrest of Ms. Raskin.

46.     Defendant Does 134-137, and 158 are NYPD members who participated in the assault and arrest of Mr. Holton.

47.     Defendant Doe 134 was a white male, upon information and belief in or around his 40's, wearing a NYPD uniform with a white shirt, who was taller than 5'7", of slim build, and who, upon information and belief, had a short haircut under his hat.

48.     Defendant Does 138-139 are NYPD members who participated in the assault and arrest of Mr. Gilbert.

49.     Defendant Does 140-142 are NYPD members who participated in the assault and arrest of Mr. Leinbach.

50.     Defendant Does 143-146 are NYPD members who participated in the assault and arrest of Plaintiff Zech.

51.     As seen is the photo below[6]:

   a.   Defendant NYPD Supervisor Doe 143 is the officer with the white shirt and the yellow gloves, who can be seen pushing Plaintiff Zech's head into the car;

---

[6] The photograph is by C.S. Muncy and is published with Jake Offenhartz, Nick Pinto, and Gwynne Hogan, "NYPD's Ambush of Peaceful Bronx Protestors Was "Executed Nearly Flawlessly," City Leaders Agree," *Gothamist*, June 5, 2020, *available online at* https://gothamist.com/news/nypds-ambush-of-peaceful-bronx-protesters-was-executed-nearly-flawlessly-city-leaders-agree.

b.  Defendant Doe 83 is the officer in the blue uniform with a face-shield helmet, with a baton in his right hand, grabbing Plaintiff Zech's arm with his other hand; and

c.  Defendant Doe 84 is the officer on the left wearing helmet number 28290.



52.     Defendant Does 147-157 are NYPD members who participated in the assault and arrest of Mr. Matney.

53.     The numbered Doe Defendants are members of the NYPD whose names are currently unknown to Plaintiffs.

54.     At all times hereinafter mentioned, Defendants were employed by the City of New York as members of the NYPD.

55.     At all times hereinafter mentioned, Defendants, either personally or through their employees, were acting under color of state law and/or in compliance with the official rules, regulations, laws, statutes, customs, usages and/or practices of the State or City of New York.

56.     Each and all of the acts and omissions of the Defendants alleged herein occurred while said Defendants were acting within the scope of their employment by the Defendant City.

57.     Defendants were duly appointed and acting officers, servants, employees, and agents of Defendant City who were acting for, and on behalf of, and with the power and authority vested in them by Defendant City, and were otherwise performing and engaging in conduct incidental to the performance of their lawful functions in the course of their duties.

58.     Defendants were each and all responsible, in whole and/or in part, for the planning for and/or creation, promulgation, implementation, and/or enforcement of the unconstitutional policies, practices and/or customs complained of herein, and/or condoned, acquiesced in, adopted, and/or approved of the same, through their acts and/or failures to act, as set forth more fully below.

59.     At all times relevant herein, and as set forth more fully below, Defendants' actions and/or failures to act were malicious, intentional, knowing, and/or with a deliberate indifference to or a reckless regard for the natural and probable consequences of their acts and/or omissions.

60.     Although they were aware of the conduct, present for it, and knew or should have known it was unconstitutional, at no time did any of the Defendants, or any other member of the NYPD, take any steps to intervene in, prevent, or otherwise limit the unconstitutional conduct engaged in by their fellow officers.

**<u>STATEMENT OF FACTS</u>**

61.     The City's and NYPD's responses to the summer 2020 Black Lives Matter protests (the "Summer 2020 Protests") in general, and the June 4, 2020 FTP4 protest in particular, were the subject of broad public scrutiny as they unfolded and have since given rise to

substantial litigation in federal and state courts as well as investigations by non-governmental

entities the New York State Attorney General, the New York City Council, and other

governmental agencies.

62.    Plaintiffs incorporate by reference the facts contained in the governmental reports

that have been issued concerning Defendants' responses to the Summer 2020 Protests, including

the reports issued by the New York State Office of the Attorney General[7], the New York City

Office of the Corporation Counsel[8], and the New York City Department of Investigation.[9]

63.    Plaintiffs further incorporate by reference the facts contain in the reports that have

been issued by non-governmental agencies concerning Defendants' responses to the FTP4

protest, including, but not limited to, the September 2020 Human Rights Watch written analysis

of the NYPD's response to the Mott Haven Protest (the "HRW Report") [10] and video report[11],

and the Physicians for Human Rights reports: "'A Targeted Attack on the Bronx' - Police

Violence and Arrests of Health Workers at a New York City Protest"[12] and "Expert Statement on

Individual and Community Effects from Trauma Due to NYPD Use of Force in Response to the

Mott Haven Protest on June 4, 2020."[13]

---

[7] Letitia James, Attorney General, State of New York, *Preliminary Report on the New York City Police Department's Response to Demonstrations Following the Death of George Floyd,* available at https://ag.ny.gov/sites/default/files/2020-nypd-report.pdf.

[8] Margaret Garnett, Commissioner, New York City Department of Investigation*, Investigation into NYPD Response to the George Floyd Protests*, ("DOI Report"), Dec. 2020, available at https://www1.nyc.gov/assets/doi/reports/pdf/2020/DOIRpt.NYPD%20Reponse.%20GeorgeFloyd%20Protests.12.18.2020.pdf.

[9] New York City Law Department, *Corporation Counsel Report Pursuant to Executive Order 58 (June 20, 2020) Directing an Analysis of Factors Impacting the George Floyd Protests in New York City* (Dec. 2020) ("OCC Report"), available at https://www1.nyc.gov/assets/law/downloads/pdf/ProtestReport-np.pdf.

[10] Human Rights Watch, "Kettling" Protesters In The Bronx: Systemic Police Brutality And Its Costs In The United States ("HRW Report"), Sept. 30, 2020, *available at* https://www.hrw.org/report/2020/09/30/kettling-protesters-bronx/systemic-police-brutality-and-its-costs-united-states.

[11] Human Rights Watch, "NYPD Beat and Arrest Peaceful Protesters in Planned Assault," Sept. 30, 2020, *available at* https://www.youtube.com/watch?v=ovsQoElXzl8.

[12] Phelim Kine and Joanna Naples-Mitchell, September 2020, *available online at* https://phr.org/wp-content/uploads/2020/09/A-Targeted-Attack-on-the-Bronx_Police-Violence_Sept-2020.pdf.

[13] Michele Heisler, et al., April 2021, *available online at* https://phr.org/wp-content/uploads/2021/04/PHR-Mott-Haven-Protest-Expert-Statement-April-2021.pdf.

64.     Plaintiffs also incorporate by reference the factual allegations set forth in other federal civil rights complaints in cases pending in the United States District Court for the Eastern District of New York arising from Defendants' responses to the Summer 2020 Protests that support Plaintiffs' claims against Defendants in this case, including:

      a.  *Ezagui v. City of New York et al.*, 20-cv-06360 (DG)(SJB);

      b.  *Fraser v. City of New York et al.*, 20-cv-05741 (NGG)(MMH);

      c.  *Gelbard et al. v. City of New York et al*, 20-cv-03163(MKB)(RER);

      d.  *Jefferey et al. v. City of New York et al.*, 20-cv-02843 (NGG)(RML);

      e.  *Richardson and Myrie v. City of New York et al*., 21-cv-03609 (LDH)(SJB);

      f.  *Smith v. City of New York et al*., 21-cv-03096 (DG)(TAM); and

      g.  *Zayer v. City of New York et al.*, 20-cv-06070 (ARR)(PK).

65.     Plaintiffs incorporate by reference the factual allegations set forth in other federal civil rights complaints in cases pending in the United States District Court for the Southern District of New York arising from Defendants' responses to the Summer 2020 Protests that support Plaintiffs' claims against Defendants in this case, including:

      h.  *Sow et al v. City of New York et al,* 20-cv-00533(CM)(GWG);

      i.  *People of the State of New York v. City Of New York et al*, 21-cv-322 (CM)(GWG);

      j.  *Payne et al v. De Blasio et al*, 20-cv-8924 (CM)(GWG);

      k.  *Sierra et al v. City of New York et al*, 20-cv-10291 (CM)(GWG);

      l.  *Wood v. De Blasio et al*, 20-cv-10541 (CM)(GWG);

      m.  *Yates v. City of New York, et al.,* 21-cv-01904 (CM)(GWG);

      n.  *Campbell v. City of New York,* 21-cv-04056 (AJN); and

      o.  *Gray, et al., v. City of New York, et al.,* 21-cv-06610 (CM)(GWG).

66.     Of those, the following complaints contain factual allegations specific to the Mott Haven Protest (by way of a representative, not exhaustive, list): *People*, ¶¶ 58, 169-170, 247-255, 284-310, 366- 387; *Wood*, ¶¶ 116-167; *Payne*, ¶¶ 59-65, 161- 173, 182-192, 194-200; *Sierra*, ¶¶ 41-124; and *Sow*, ¶¶ 86-93, 310-329, 332-345, 348-390, 392-418.

67.     Of those, the following complaints contain factual allegations specifically about Plaintiffs (by way of a representative, not exhaustive, list): *People*, ¶¶ 262-297; *Wood*, ¶123; *Payne*, ¶¶ 62, 65; *Sierra*, ¶ 71; *Sow*, ¶¶ 91, 109, 122.

A.  **The National Lawyers Guild ("NLG") – NYC Chapter ("NLG-NYC") Legal Observer Program.**

68.     According to its website (http://www.nlg.org), the NLG "was founded in 1937 as an association of progressive lawyers and jurists who believed that they had a major role to play in the reconstruction of legal values to emphasize human rights over property rights. The Guild is the oldest and most extensive network of public interest and human rights activists working within the legal system." The NLG-NYC is a local NLG chapter.

69.     NLG-NYC Legal Observers have been observing and documenting NYPD response to protests in the City streets since the late 1960's and are well-known to NYPD members.

70.     The NLG's Legal Observer program was established in 1968 in New York City in response to protests at Columbia University and city-wide antiwar and civil rights demonstrations.

71.     NLG-NYC Legal Observers are legal workers, law students, and lawyers trained by the NLG-NYC to observe and document police response to protests.

72.     When a Legal Observer completes the NLG-NYC's Legal Observer training, the NLG-NYC issues them a bright neon green hat, as well as a badge on a lanyard, which prominently feature the NLG-NYC logo and the words "LEGAL OBSERVER."

73.     These items clearly identify their wearers as NLG-NYC Legal Observers to all – including NYPD members:

 

74.     The First Amendment to the United States Constitution, and the attendant provisions of the New York Constitution, protect the rights to observe and document the activities of uniformed police in traditional public for a such as the New York City streets, including police responses to protest, and arrest activity, subject to reasonable time, place, manner restrictions.

75.     In derogation of those rights, the NYPD has a long history, pattern, practice, and custom of unlawfully curtailing the rights of witnesses and those who seek to document such police activities, including by using force on, arresting, and/or prosecuting bystanders and observers, including, but not limited to, press.

76.     In 1977, the NYPD entered into a Stipulation and Order in *Black v. Codd*, 73 Civ. 5283 (JMC) (SDNY, June 1, 1977). The *Black v. Codd* Stipulation and Order states:

> [I]t is the policy of the New York City Police Department and the defendants that when a person (or persons) is detained, stopped or arrested in public areas, a person or persons not involved in the conduct of which the first person is stopped or arrested may remain in the vicinity of the stop or arrest as an onlooker or onlookers, subject to the safety of the person stopped, the third persons, the general public, and officers of the Police Department, and to provisions of law e.g. P.L. § 195.05.

77.     The *Black v. Codd* Stipulation and Order defines an "onlooker" as a "person remaining in the vicinity of a stop or arrest" and states that onlookers "shall not be subject to arrest for violation of Penal Law § 195.05 unless the officer has probable cause to believe a violation of § 195.05 exists."  It further states that "[t]aking photographs" and "[r]emaining in the vicinity of the stop or arrest" explicitly do not "constitute[] probable cause for arrest or detention of an onlooker unless safety of officers or other persons is directly endangered or the officer reasonably believes they are endangered or the law is otherwise violated." The *Black v. Codd* Stipulation and Order also requires that the arresting officer shall "report the action" of a bystander arrest to a supervisor at the precinct.

78.     The *Black v. Codd* Stipulation and Order has historically been ignored.  *See, e.g., Tonge v. Kelly*, 19993 WL 16121 (EDNY, 1993) ("the City failed for ten years to maintain the formal guidelines to which it had agreed and to inform its police recruits and officers in its Patrol Guide of the standards established in the *Codd* consent order").

79.     Relatedly, the version of the NYPD Patrol Guide ("PG") that was in effect in June of 2020 recognizes the rights of people to observe, photograph, and record police activity in public places without interfering with police operations.

80.     For example, PG § 203-29 (When a Member of the Service Encounters an Individual Observing, Photographing, or Recording Police Activity), issued on June 12, 2018,

stated: "Individuals have a right to lawfully observe and/or record police activity including, but

not limited to detentions, searches, arrests or uses of force."

81.     PG § 203-29 further instructed NYPD members that they must "NOT:

(1) Threaten, intimidate, or otherwise discourage an observer from recording the
    police officer's activities; or
(2) Intentionally block or obstruct cameras or other recording devices when there
    is no legitimate law enforcement reason to do so; or
(3) Delete any pictures or recordings from observer's recording device or order
    observer to delete such pictures or recordings."

82.     Additionally, PG § 203-29 dictated that, unless they engage in other actions that

are independent violations of the law, "an individual CAN NOT be arrested for:

(1) Taking photographs, videotaping, or making a digital recording;
(2) Requesting or making note of shield numbers or names of members of the service;
(3) Criticizing the police or objecting to police activity;
(4) Refusing to leave the area; or
(5) Using crude or vulgar speech."

83.     Beyond that, PG § 203-29 included examples of the kinds of conduct that give

rise to the sort of "[a]ctual interference with the performance of an official function" that is

typically required to support the arrest of a person observing, photographing, or recording police

activity, as follows:

        …actual physical force (touching or physically interfering with the officer or the
        suspect, i.e., using a camera so close to the officer's face that it intentionally
        obstructs his or her view), or intruding into the physical space necessary to safely
        perform police operations and refusing to obey an order to move back, or
        purposefully engaging in passive behavior that prevents an officer from taking
        enforcement action (i.e., blocking a prisoner van, etc.).

84.     Additionally, in the event the NYPD were to arrest someone who is observing,

photographing, or recording police activity, PG § 203-29 required the NYPD members involved

to inform a supervisor.

85.     Beyond that, with respect to the rights of Legal Observers specifically, the version of PG § 213-11 (Policing Special Events/Crowd Control) that was in effect in June of 2020 explicitly permitted properly identified Legal Observers "free access through police lines at the scene of any demonstration… subject only to restrictions necessitated by personal safety factors"; requires "[a]ll" police to "extend every courtesy and cooperation to" them; and directed: "Observers shall be permitted to remain in any area, or observe any police activity, subject only to restrictions necessitated by personal safety factors, as determined by the incident commander."

86.     Despite the written policies reflected in PG § 203-29, between the time PG § 203-29 was inaugurated in 2018 and the June 4, 2020 FTP4 Protest, NYPD members continued to violate the rights of witnesses, observers, and those seeking to document uniformed police activities in public places on a persistent and widespread basis, flouting the requirements of PG § 203-29.

87.     For example, the *Gray* complaint referred to above and incorporated by reference herein includes a litany of examples of such NYPD misconduct.

88.     And, although Defendants de Blasio, Shea, Monahan, and Hart knew or should have known that NYPD members were violating the rights of witnesses, observers, and those seeking to document uniformed activities in public places on a persistent and widespread basis, including in connection with the Summer 2020 Protests and the FTP4 Protest, they failed to train, supervise, or discipline the responsible NYPD members, ratifying their misconduct and sending the clear message that NYPD and Defendant City brass endorse and support it.

### B. Defendant de Blasio issues Curfew Orders in New York City, and the NYPD Directs Officers to Implement the Curfew Orders Incorrectly and Illegally.

89.     Prior to June 4, 2020, Defendant de Blasio had issued several emergency executive orders related to "the presence of Covid-19 in the city."

90.     The first Emergency Executive Order (Executive Order No 98) was issued on March 12, 2020, and was extended by Emergency Executive Order No 112 on May 9, 2020.

91.     On June 1, 2020, Defendant de Blasio issued Emergency Executive Order 117, citing an alleged escalation of protest activity to include acts of assault, vandalism, property damage and/or looting (at unspecified dates, times and/or locations) and enacting a city-wide curfew beginning at 11:00 p.m. on June 1, 2020 until 5:00 a.m. on June 2, 2020.[14]

92.     Then, Defendant de Blasio issued Emergency Executive Order 118, ordering a city-wide curfew from 8:00 p.m. on June 2, 2020 until 5:00 a.m. on June 3, 2020.[15]

93.     And building on that, Defendant de Blasio finally issued Emergency Executive Order 119, ordering a city-wide curfew from June 3, 2020 to June 8, 2020 between the hours of 8:00 p.m. and 5:00 a.m.[16]

94.     That curfew — from 8:00 p.m. to 5:00 a.m. — was in effect on June 4 when the FTP4 Protest took place.

95.     Finally, Emergency Executive Order 119 contained the following exemptions for people performing "Essential work":

> This Order shall not apply to police officers, peace officers, firefighters, first responders and emergency medical technicians, individuals travelling to and from essential work and performing essential work, people experiencing homelessness and without access to a viable shelter, and individuals seeking medical treatment or medical supplies. "Essential work" is work performed by essential businesses or entities as defined or permitted by the Empire State

---

[14] *See* Emergency Executive Order No. 117, *available at*
https://www1.nyc.gov/assets/home/downloads/pdf/executive-orders/2020/eeo-117.pdf.
[15] *See, e.g.,* https://twitter.com/NYCMayor/status/1267642422194057217?s=20; Emergency Executive Order No. 118, *available at* https://www1.nyc.gov/assets/home/downloads/pdf/executive-orders/2020/eeo-118.pdf.
[16] *See* Emergency Executive Order No. 119, *available at*
https://www1.nyc.gov/assets/home/downloads/pdf/executive-orders/2020/eeo-119.pdf.

Development Corporation.

96.     The Empire State Development Corporation's relevant guidance categorized "lawyers" as people providing "[p]rofessional services with extensive restrictions" and stated:

> Lawyers may continue to perform all work necessary for any service so long as it is performed remotely. Any in-person work presence shall be limited to work only in support of essential businesses or services; however, even work in support of an essential business or service should be conducted as remotely as possible.[17]

97.     By the terms of Emergency Executive Orders 117, 118 and 119 (collectively, the "Curfew Orders"), "a failure to comply with the Order[s] shall result ***in orders to disperse***" (emphasis added).[18]

98.     The Curfew Orders also provided that "any person who knowingly violates the provisions in this Order shall be guilty of a Class B misdemeanor" under NYC Administrative Code ("AC") § 3-108.

99.     AC § 3-108 contains a knowing intent requirement: "Any knowing violation of a provision of any emergency measure established pursuant to this chapter shall be a class B misdemeanor punishable by a fine of not more than five hundred dollars, or by imprisonment for not more than three months, or both."

100.     Under New York Penal Law ("PL") § 15.05, "A person acts knowingly with respect to conduct or to a circumstance described by a statute defining an offense when he is aware that his conduct is of such nature or that such circumstance exists."

101.     As the plain text of the Curfew Orders, AC § 3-108, and PL § 15.05 make clear, a violation of the Curfew Orders could not have occurred  unless the alleged violator had received

---

[17] *See* https://esd.ny.gov/guidance-executive-order-2026.
[18] E.O. 117 technically had a typo, stating "[f]ailure to comply with this Order shall result in orders to disburse." That typo was corrected in the subsequent Curfew Orders.

an audible order to disperse, along with an appropriate opportunity to disperse, and had refused to leave.

102.    As the plain text of the Curfew Orders, AC § 3-108, and PL § 15.05 also make clear, there would be no probable cause to arrest an alleged violator unless the alleged violator had received an audible order to disperse, along with an appropriate opportunity to disperse, and had refused to leave.

103.    The NYPD issued two official statements directing officers how to implement the Curfew Orders, through the FINEST message system (which sends internal messages to NYPD members).

104.    First, on July 1, the NYPD Operations Division used the FINEST system to instruct officers that "[curfew e]nforcement will only be taken after *several* warnings are issued *and* the violator is refusing to comply" (emphasis added). [19]

105.    However, in a FINEST message sent June 3, the NYPD Operations Division omitted any reference to warnings or orders to disperse, directing simply that "[i]f [members of the service] observe a person violating the curfew, a C-Summons may be issued for Admin. Code 3-108, Violating a Mayoral Emergency Order."[20]

106.    Thus, at the June 4 protest, the official policy of NYPD and the City of New York was that orders to disperse and opportunities to comply were not required before arrests for alleged Curfew Orders violations could be made — and that the simple fact that protesters were out past 8:00 p.m. on June 4 at Mott Haven (having been trapped there by NYPD) was sufficient cause for using force on, arresting, and prosecuting them.

---

[19] NYPD FINEST Message, *City-Wide Curfew* (June 1, 2020).
[20] NYPD FINEST Message, *Curfew Extension* (June 3, 2020).

C. **Representatives of Defendants City and de Blasio Stated that Legal Observers Were "Essential Workers" Under the Curfew Orders.**

107.    During the Summer 2020 Protests and including the time period in which the Curfew Orders were in effect, Legal Observers who observed and sought to document police response to protests in the streets, as well as legal workers and others who provided "jail support" outside precincts and at courthouses from which arrested protesters were released after processing, performed "essential work" that could not be performed remotely.

108.    For example, Legal Observers typically collect the names of arrestees at the scene of arrests, and try to learn from police where they will be taken for arrest processing, in order to provide those names and that information to lawyers and legal workers as soon as possible after the arrests occur.

109.    Only after NLG-NYC lawyers and legal workers confirm where police have brought arrestees for arrest processing – which often requires working with Legal Observers and others who are physically present at several different locations – can they provide police processing those arrests with written letters of representation invoking the arrestees' rights to counsel, as well as communicate with them, and clients in custody, about the clients' health, the status of their arrest processing, and other, similar matters.

110.    Beyond that, NLG-NYC lawyers and legal workers also perform "essential work" with people who provide jail support to arrestees by maintaining a physical presence wherever arrestees are being released from police custody.

111.    Doing such "jail support" is the only way to ensure that arrestees are actually released and to connect them with further legal support, representation, and other resources in a timely manner.

24

112.     Those Legal Observer, legal, and jail support activities are clearly protected under the First Amendment, among other ways, and when lawyers and legal workers cannot engage in them, arrestees suffer frustrations of their rights to remain silent and to legal counsel as well as other important constitutional and other rights.

113.     By the time the first of the Curfew Orders was announced on June 1, 2020, the mass arrests the NYPD had made in the days prior, and the NYPD's use of and adherence to problematic large-scale arrest processing procedures, had already created emergency conditions that severely interfered with, and in many cases prevented, Legal Observers, lawyers, and legal workers from performing their essential work. For example, the NYPD's large-scale arrest processing procedures effectively prevented arrested protesters from communicating with legal counsel (or anyone else), and also prevented lawyers and legal workers for arrested protesters from communicating with police about arrested clients while they were in NYPD custody.

114.     In fact, those serious impediments to providing legal representation to arrested protesters around the time Defendant de Blasio announced the first of the Curfew Orders had prompted the NLG-NYC; virtually all of New York City's public defenders (The Legal Aid Society, The Bronx Defenders, Brooklyn Defender Services, New York County Defenders Services, and Neighborhood Defender Services of Harlem); 5Boro Defenders; as well as the Benjamin N. Cardozo School of Law Criminal Defense Clinic and The Defenders Clinic of CUNY School of Law to write a joint letter dated June 3, 2020 to NYPD Defendants Shea and de Blasio demanding that the NYPD and the City take immediate steps to remedy what were then already serious and ongoing problems. A copy of the letter is attached and incorporated by reference herein.[21]

---

[21] A copy of the letter is also available online at https://legalaidnyc.org/wp-content/uploads/2020/06/2020-6-3-Letter-Re-1PP-Pre-Arraignment-Communication-Issues.pdf. On June 4, 2020, a few hours before the Mott Haven

115.     Against that backdrop, as soon as the first of the Curfew Orders was announced, those providing critical legal support to arrested protesters obtained confirmation that Defendant City viewed Legal Observers, and legal workers performing jail support, as exempt "essential workers" on an emergency basis.

116.     For example, on June 1, 2020, Amanda Wallwin, Chief of Staff for Assemblyman Dan Quart, e-mailed Jenny Sobelman, Chief of Staff, Mayor's Office of State Legislative Affairs, asking "Are there any plans to exempt folks who are doing jail, legal and medical support for arrested protestors?" and "[S]o supports for arrested protestors are not exempt from the curfew, correct?"

117.     At 8:32pm on June 1, 2020, Ms. Sobelman responded on behalf of the Mayor's Office: "Yes. They are exempt from the curfew."

118.     Additionally, in response to a separate inquiry from a separate party, Tan Persephone, a Legislative Representative at the Mayor's Office of City Legislative Affairs, confirmed in an e-mail sent at 9:41pm on June 1, 2020 that she had "checked in with the Mayor's counsel who confirmed: yes, those lawyers are essential and can show up in person if they can't do their work remotely. Protecting one's liberty is about as essential as it gets. If non-lawyers are volunteering to provide essential support to the lawyers, they are essential as well." That e-mail cc'd Eric Cecil Henry, General Counsel, City Legislative Affairs – Office of the Mayor.

119.     Based on those confirmations from representatives of Defendant City that Legal Observers were "essential workers", the NLG-NYC drafted an "Attestation of Essential

---

mass arrests, *The City* reported on the joint letter. *See* Rosa Goldensohn, "NYPD Shut Off George Floyd Protesters From Legal Help, Attorneys Charge," *The City,* June 4, 2020, available online at https://www.thecity.nyc/2020/6/4/21280746/nypd-shut-off-george-floyd-protesters-from-legal-help-attorneys-charge.

Services" to provide to Legal Observers who would volunteer during the curfew, in order to provide them some measure of protection in the event the NYPD decided to interpret Defendant de Blasio's curfew differently than those Mayoral officials.

120.    Beginning on June 1, 2020 and throughout the time period in which the Curfew Orders were in effect, including on June 4, 2020, the NLG-NYC provided each LO volunteer with an "Attestation of Legal Services" to fill out and carry, as well as copies of the e-mails between Ms. Wallwin and Ms. Sobelman to carry.

121.    The NLG-NYC Attestation of Essential Services was printed on NLG-NYC letterhead and stated:

Attestation of Essential Services

Attention: Law Enforcement Official

I, _____, attest that I am a volunteer Legal Observer with the Mass Defense Committee of the National Lawyers Guild – NYC Chapter.

Per order of the city's essential services provision, my volunteer function is categorized as essential services. The Chief of Staff of Mayor De Blasio, Office of State Legislative Affairs, has confirmed in writing to the Chief of Staff of Assemblymember Dan Quart that volunteers providing "jail, legal, and medical support," including both lawyers and non-lawyers providing legal support to clients who have been arrested in connection with a protest, are exempted workers under the order directing the terms of the curfew.

As a Legal Observer, I am providing legal support to arrested protestors. This support is essential in the protection of the First Amendment rights of the citizens of New York City, as well as for the smooth functioning of the arraignment process. As part of the legal support that I am providing, my travel throughout the city constitutes "essential work" as confirmed by the office of Mayor De Blasio.

The above named individual may present identification and this letter as instructed.

122.     The Attestation included signature and date lines for each LO to fill out. Finally, the Attestation provided that, for "verification or with any questions", the NYPD should contact the NLG-NYC or its President, and provided phone numbers for both, so that police could verify that a Legal Observer bearing a NLG-NYC Attestation of Essential Services was indeed volunteering with the NLG-NYC at any time.

**D.  Defendants City, de Blasio, Shea, Monahan, Hart, and other NYPD Members Fails to Train or Supervise Regarding Enforcement of the Curfew Orders, Including Against Legal Observers.**

123.     Upon information and belief, aside from the FINEST messages described above, Defendant City representatives failed to train or supervise NYPD members in enforcing the Curfew Orders, including in how to interpret and apply the exemptions contained in the Curfew Orders for "essential workers."

124.     Upon information and belief, Defendants City, de Blasio, Shea, Monahan, Hart, and other NYPD members conducted no training, or inadequate training, for NYPD members regarding how to interpret and apply the exemptions contained in the Curfew Orders for "essential workers" as to Legal Observers.

125.     Additionally, Defendants City, de Blasio, Shea, Monahan, Hart, and other NYPD members conducted no training, or inadequate training, to Defendant Rice as to the NYPD's written policies regarding

126.     And, as seen below, Defendants City, de Blasio, Shea, Monahan, Hart, Lehr, and other NYPD members failed to supervise, investigate, and/or discipline their subordinates in connection with their roles in suppressing and brutalizing the FTP4 Protest, as well as arresting Plaintiffs and otherwise violating their rights.

**E.  NYPD Kettles and Suppresses the FTP4 Protest at Mott Haven.**

28

127.    On June 4, 2020, Plaintiffs were volunteering as NLG-NYC LOs to observe police response to the FTP4 Protest that began with a rally around "the Hub" at 3rd Avenue and 149th Street in the Bronx.

128.    That evening, NYPD members apparently escorted, acquiesced in, and/or facilitated a demonstration and march that began around "The Hub" at 149th Street and 3rd Avenue and continued through the Mott Haven streets, eventually proceeding south on Willis Avenue toward the Willis Avenue Bridge.

129.    The Hub is one of the "most dynamic commercial centers" in the Bronx and has been called "the Times Square of the Bronx."[22] The description is apt for the geographic configuration of The Hub, which is formed by the intersection of East 149th Street and Willis, Melrose, and Third Avenues.

130.    Most of the protestors initially met at The Hub located at 149th Street in Bronx County, at or around 6:00 p.m.

131.    Among the purposes of the June 4th rally were to demand racial justice and accountability for police violence against Black people and people of color. The protesters chanted "I can't breathe" – the last words of George Floyd and of Eric Garner, who was killed by an NYPD officer – and other messages critical of the NYPD.

132.    Protesters left The Hub and marched through the Mott Haven neighborhood.

133.    In an effort to suppress the Mott Haven protesters' message and to intimidate them, Defendants orchestrated an operation to corral, or "kettle," the protesters, assault them, and arrest them.

---

[22] Alison Gregor, *People, Shops and Roads Converge Here*, N.Y. TIMES (June 8, 2012)

134.    Defendants' plan for the June 4th Mott Haven protest was to instill fear in the protesters and others who might join them in future protests.

135.    From the outset, there was a large police presence surrounding The Hub, with officers placed on rooftops, near subways, and many were dressed in full riot gear, including Kevlar vests, helmets and forearm plutes.

136.    As protesters began marching down Third Avenue, NYPD members accompanied them and followed them the entire time.

137.    The march itself proceeded with little or no interaction with NYPD as it made its way toward East 136th Street.

138.    The march continued through the grounds of the Patterson Houses, a public housing project whose residents are primarily people of color. Residents voiced their support for the protesters' message: some leaned out their windows banging pots and pans.

139.    The march continued south on Willis Avenue, still accompanied by police. At various times, protesters chanted slogans expressing their anger over the conduct of the NYPD in their community.

140.    At some time before 8:00 p.m. (upon information and belief, several minutes before 7:45 p.m.), NYPD Strategic Response Group officers wearing dark padding or body armor and bike helmets formed a line with their bodies and NYPD bicycles at 135th Street and Willis Avenue, causing the protesters to turn left (east) onto 136th Street.

141.    At around the same time and/or as the protesters proceeded east on 136th Street, Defendants NYPD Members John and Jane Does 1-20 (the "Brook Avenue Line Does") formed a police blockade ahead of, and downhill from, the protesters, on 136th Street at Brook Avenue (the "Brook Avenue Line").

142.    As protesters arrived on the 136th Street block between Brown Place (on the west) and Brook Avenue (on the east, downhill), they encountered the Brook Avenue Line.

143.    At around the same time as the protesters encountered the Brook Avenue Line, Defendants NYPD Members John and Jane Does 21-40 (the "Brown Place Does") formed a second police blockade on 136th Street and Brown Place (the "Brown Place Line").

144.    Also at around the same time, a third group of Defendants NYPD Members John and Jane Does 41-60 (the "Sidewalk Lines Does") formed a third police blockade between the 136th Street roadway and the sidewalks to the north and south of 136th Street (the "Sidewalk Lines"), effectively preventing people trapped on the roadway between the Brook Avenue Line and the Brown Place Line from going onto the sidewalk, and people trapped on the sidewalk from entering the roadway.

145.    The Brook Avenue Line Does, Brown Place Does, and Sidewalk Line Does formed a police trap or "kettle" from which protesters, including Plaintiffs (as described in more detail below) could not leave – the "Mott Haven Kettle."

146.    At no time – from when the protesters gathered at The Hub until they were kettled on East 136th Street – did any NYPD officer order the protesters to disperse.

147.    On the contrary, the police escorted the protesters on the entire march from The Hub to East 136th Street, and stopped vehicular traffic on cross streets to permit the march to proceed safely.

148.    Once the Mott Haven Kettle was formed, NYPD members did not permit those within the kettle who were not NYPD members to leave the kettle.

149.    As the protesters were held in the kettle, they asked NYPD officers to allow them to leave, and chanted "Let us go, let us go."

150.    The NYPD did not permit protesters to leave the kettle.

151.    With the protesters trapped, the NYPD launched the next phase of its plan.

152.    The back and front lines of Mott Haven Kettle (that is, the Brown Place Line and the Brook Avenue Line) pressed in, pushing the protesters tightly together — condensing the Mott Haven Kettle in space, while paradoxically demanding protesters directly in front of the Brook Avenue Line "move back" into the part of the crowd being pressed forward by the Brown Place Line.

153.    Once police formed the Mott Haven Kettle, NYPD members began to grab and handcuff arrestees, in some cases shoving, grabbing, and/or beating trapped protesters.

154.    Defendant Monahan, the NYPD's highest-ranking uniformed member, was present supervising and directing police actions at the Mott Haven Kettle scene.

155.    Upon information and belief, Defendant Monahan acted as NYPD "Incident Commander" within the meaning of NYPD Patrol Guide (the person "responsible for the command, control and coordination of all incident operations") with respect to, and/or otherwise planned and/or supervised the deployment of, the Mott Haven Kettle.

156.    Defendant Lehr, Commanding Officer of the Patrol Borough Bronx, was present supervising and directing police actions at the Mott Haven Kettle scene.

157.    Defendant Rice was also present giving advice related to, supervising, and directing police actions at the Mott Haven Kettle scene.

158.    Defendants NYPD Supervisors John and Jane Does 61-80 (the "NYPD Supervisor Does") are NYPD members of the rank Sergeant and above who were other supervisors involved in planning for, deploying, and/or supervising the deployment of the Mott Haven Kettle.

159.     Defendants Monahan, Lehr, Rice, the NYPD Supervisor Does,  the Brook Avenue Line Does, Brown Place Does, Sidewalk Line Does, and other NYPD members, including the other NYPD members discussed or described below, detained and arrested Plaintiffs and other arrestees in the Mott Haven Kettle on 136th Street between Brook Avenue and Brown Place.

160.     Additionally, upon information and belief, Defendant Monahan and other NYPD members were involved in planning for, supervising, and/or deploying the large-scale arrest processing procedures to which Plaintiffs were subjected based on their arrest at a protest, also mentioned below, including the decisions not to issue Plaintiffs summonses on the street and instead to subject Plaintiffs to unduly lengthy, and unsafe, mass arrest processing.

161.     And beyond that, since June 4, 2020, Defendants de Blasio, Shea, Monahan, their subordinates, and other Defendant City representatives, have failed to train, investigate, supervise, or discipline any of the involved NYPD members in a meaningful way.

162.     To the contrary, Defendants de Blasio, Shea, and Monahan have publicly applauded each other in connection with, and otherwise justified and defended, the entire police operation.

163.     Upon information and belief, this "kettle" was fully formed by the Defendants at approximately 7:45 p.m., trapping most of the protestors inside.

164.     Thus, protesters were unable to comply with the nominal orders to disperse the NYPD gave after the trap had already been sprung.

165.     No NYPD member had individualized probable cause to arrest any Plaintiff.

166.     Just after 8:00, a brutal assault began.

167.    Police officers with batons and shields struck people at the edge of the encircled group, thrust raised bicycles into trapped protesters, and indiscriminately sprayed them with pepper spray.

168.    In some instances, officers pulled down protesters' COVID-protective face masks and pulled up face shields to pepper spray protesters directly in the face.

169.    The protesters had committed no acts of violence or resistance that would justify this excessive and unreasonable use of force.

170.    Many protesters were left injured and bleeding. Some protesters fainted, or lost consciousness and went into convulsions.

171.    Defendant Monahan personally ordered the arrest of one of the organizers and leaders of the protest — Shellyne Rodriguez — who was committing no offense and was engaged in protected speech at the very moment he ordered officers to arrest her.

172.    Despite their unambiguous status as essential workers exempt from the curfew, along with the fact that they were carrying communications showing Defendant de Blasio had said as much, volunteer medics and National Lawyers Guild – NYC Chapter Legal Observers were arrested.

173.    Upon information and belief, the purpose of arresting such workers was to ensure that medical care was denied to injured protesters to further the deterrent effect of the crackdown, and to prevent people like Plaintiffs from having documentation of exactly what happened, and which officers harmed them.

174.    Individuals who happened to be in the vicinity of East 136th Street and Brook Avenue at the time of the police operation – individuals who had not marched from The Hub and were not protesting – were also arrested.

34

175.    In the next phase of the NYPD's operation, officers began to systematically handcuff the kettled protesters and subject them to lengthy large-scale arrest processing.

176.    Many protesters, who had done nothing to the officers and were not resisting arrest, were violently thrown to the ground before they were handcuffed.

177.    Officers pulled protesters out of the kettle and used unnecessary force to bring their arms behind them.

178.    Officers systematically applied zip-tie cuffs that were cinched tighter than necessary.

179.    In some instances, officers literally lifted protesters off the ground using the zip-tie cuffs.

180.    Many protesters complained that their zip-tie cuffs were too tight and were causing their hands to become numb, and many protesters' hands turned purple.

181.    Instead of issuing protesters summonses on the street consistent with the requirements of the New York Criminal Procedure Law, the NYPD held protesters over in overly tight zip-tie cuffs and transported them in close quarters to a large-scale arrest processing facility.

182.    Throughout the NYPD's June 4th operation, most of the officers did not wear face masks or face shields to prevent the transmission of the coronavirus.

183.    On June 4, 2020, New York City had suffered more than 280,000 reported cases of COVID-19, and over 1,000 new cases were reported that day.

184.    Unlike the police, most of the protesters did wear masks or face shields, but in many instances, officers forcibly removed protesters' masks and face shields, further endangering their safety.

185.    Once arrested, people were unable to re-position their masks to cover their noses and mouths while they were rear-cuffed, and as a result, they were transported to the arrest processing facilities in enclosed vehicles without proper face coverings. Protesters complained that their faces were left uncovered, but NYPD members did nothing to assist them.

**F.  NYPD Members, Including Defendant Rice, Target Plaintiff NLG-NYC Legal Observers.**

186.    As described more fully below, Defendant NYPD members, including Defendant Rice, targeted Plaintiff NLG-NYC Legal Observers at the Mott Haven Kettle, ordering and assisting in using force on, arresting, and handcuffing them.

187.    For example, video evidence as well as witness statements show Defendant Rice on the scene specifically singling out and targeted NLG-NYC Legal Observers who were not obstructing police activities or causing any safety threat to be grabbed and handcuffed, in violation of their constitutional and statutory rights and the applicable NYPD Patrol Guide provisions. *See* https://youtu.be/yuJWAEqfHO8.

188.    The beginning of the video shows protesters and others watching Plaintiff Jonathan Davis within the Mott Haven Kettle and being placed in handcuffs. In response, people point out that he is a Legal Observer and ask, "Why is he being arrested?"

189.    Defendant Rice can then be seen on the video shouting to NYPD members present, "Legal Observers CAN be arrested, you're good to go," pointing at some of Plaintiffs who were on a nearby sidewalk.

 

190.    After Defendant Rice gave that direction, NYPR members physically arrested a number of Plaintiffs – in several cases, roughly or violently – and placed in plastic flex-cuffs.

191.    Additionally, in several instances, NYPD members either seized, searched, or destroyed confidential and privileged Legal Observer notes.

192.    As seen below, although many Defendant City policymakers, including Defendants de Blasio, Shea, Monahan, and Hart, have long known that Defendant Rice and other Defendants and NYPD members had arrested and otherwise violated Plaintiffs' rights, rather than supervising, investigating, and disciplining them, and/or taking other remedial measures such as training, re-training, and future monitoring, they have ratified and endorsed the misconduct of those who illegally used force on, arrested, handcuffed, and otherwise violated Plaintiffs' rights.

**G.  Allegations Specific to Each Plaintiff.**

**Plaintiff Rex Santus**

193.    Plaintiff Rex Santus is a law student at CUNY School of Law.

194.    At all times relevant herein, Mr. Santus was clearly identified as a NLG-NYC

Legal Observer, in that he was wearing a bright neon green hat, which prominently features the

NLG-NYC logo and the words "LEGAL OBSERVER."

195.    At all times relevant herein, Mr. Santus had an NLG-NYC Attestation of Essential

Services printed on NLG-NYC letterhead in his possession.

196.    Mr. Santus first arrived in the Mott Haven area around 6:30 p.m.

197.    At between 6:30 and 6:45 p.m. at or around 149th Street and 3rd Avenue,

Defendants NYPD members John Does 81-88, all male, detained Mr. Santus, searched Mr.

Santus and seized his property, and questioned him, without consent, probable cause, or lawful

justification.

198.    Specifically, Defendant Does 81-88 pulled in front of Mr. Santus in a silver

unmarked minivan, exited, and surrounded Mr. Santus on all sides with his back to a building.

199.    Defendant Does 81-88 blocked Mr. Santus's path.

200.    One of Defendant Does 81-88 held out his hand in a manner that prevented Mr.

Santus from walking farther.

201.    One or more of Does 81-88 then subjected Mr. Santus to custodial questioning

without any advice of rights or consent, and without allowing Mr. Santus the opportunity to

consult with counsel.

202.    None of these officers was wearing a COVID-protective face mask, nor did any of

them practice appropriate social distancing.

203.    Then, one of Does 81-88 demanded Mr. Santus's identification.

204.     One of Does 81-88 also seized Mr. Santus's Legal Observer notes, which are privileged as attorney work product, and began to leaf through and read their contents.

205.     Does 81-88 acted as if they had no idea what they National Lawyers Guild or a Legal Observer was.

206.     But Mr. Santus overheard an officer on the radio saying, in sum and substance, "a lot of green hats out here tonight."

207.     One of Does 81-88 accused Mr. Santus of "illegal counter-surveillance of the NYPD."

208.     They continued to question Mr. Santus, until Mr. Santus refused to answer question without an attorney.

209.     One of Does 81-88, who had been reviewing Mr. Santus's privileged notes, remarked that he had written down "cops with black tape," in noting that many officers were covering their badge numbers with black tape.

210.     That officer was wearing black tape covering his badge number.

211.     That officer, not wearing a mask, got within 12 inches of Mr. Santus's face and demanded, "What do you think this tape means?"

212.     The officer then noticed that Mr. Santus appeared frightened, and asked about that.

213.     Mr. Santus said, in sum and substance, "Yes, I am frightened, I am alone and surrounded by cops."

214.     Mr. Santus then reiterated that he did not want to speak without an attorney.

215.     The officer said, "fine, then stop speaking."

216.    Does 81-88 eventually released Mr. Santus, after one officer said, in sum and substance, "he's clean."

217.    That officer had been using a device and handling Mr. Santus's ID.

218.    Later that evening, after the Mott Haven Kettle was formed on 136th Street between Brown Place and Brook Avenue, as Mr. Santus attempted to perform his work as a Legal Observer by recording the names of arrestees, at least Defendant NYPD member John or Jane Doe 90 grabbed Mr. Santus from behind and forced Mr. Santus down to the ground.

219.    An officer, NYPD Member John or Jane Doe 89, told Mr. Santus to "do the smart thing" as he was being grabbed and shoved to the ground.

220.    Then, one of Defendants NYPD members John or Jane Does 90-92 rear-cuffed Mr. Santus with tight, plastic flex-cuffs.

221.    Defendant NYPD Member John Doe 93, a male NYPD officer, then unlawfully searched Mr. Santus's person and seized Mr. Santus's property, including, but not limited to, Mr. Santus's identification, which NYPD Member John Doe 94 or another NYPD member took a photograph of and/or otherwise documented information from.

222.    After an extended period of time, during which time Mr. Santus remained in handcuffs, one of Does 94-95, or a different NYPD Member , John Doe 96, cut off the handcuffs and released Mr. Santus.

223.    Mr. Santus has not acted as a Legal Observer since this incident.

**Plaintiff Krystin Hernandez**

224.    Plaintiff Krystin Hernandez is a law student at City University School of Law.

40

225.     At all times relevant herein, Mx. Hernandez was clearly identified as a NLG-NYC Legal Observer, in that Mx. Hernandez was wearing a bright neon green hat, as well as a badge on a lanyard, which prominently feature the NLG-NYC logo and the words "LEGAL OBSERVER."

226.     At all times relevant to herein, Mx. Hernandez had an NLG-NYC Attestation of Essential Services printed on NLG-NYC letterhead in Claimant's possession.

227.     Mx. Hernandez Legal Observed the protest along with their husband, Plaintiff Jalen Matney.

228.     Mx. Hernandez arrived at the protest shortly after 6:00 p.m.

229.     Beginning shortly after that, Mx. Hernandez partnered with Plaintiff Sarah Mills-Dirlam to document police covering their shield numbers.

230.     They saw a large number of officers who had covered their shield numbers with black tape or bands.

231.     However, when they tried to document those officers, some objected and told them, in sum and substance, to "keep moving" or "move along."

232.     In one specific instance, Ms. Mills-Dirlam told an officer that covering his badge number was in appropriate, but he responded by saying in sum and substance to "keep it moving" and he further covering his badge with his hand.

233.     In response, the NYPD member told Ms. Mills-Dirlam's in sum and substance to "keep it moving" and he further covered his badge with his hand.

234.     And Mx. Hernandez (who was also present) asked, in sum and substance, "is it legal to cover your badge number?" that NYPD member told both of them, in effect, "you need to move along."

235.    After the Mott Haven Kettle was formed, Mx. Hernandez was on the south sidewalk between Brook Avenue and Brown Place when they saw an NYPD member grab Plaintiff Sarah Mills-Dirlam from the sidewalk and drag her into the street.

236.    Mx. Hernandez began screaming to ask Ms. Mills-Dirlam for her last name.

237.    However, at that time, Defendant NYPD Supervisor John Doe 97, who was wearing a NYPD uniform with a white shirt, grabbed Mx. Hernandez forcefully, and pulled them into around the middle of the roadway, saying in sum and substance, "No, you're going too!"

238.    In the roadway, Defendant Doe 97 grabbed Mx. Hernandez on the shoulder and arm and pushed Mx. Hernandez at a group of officers in blue shirts and riot gear helmets.

239.    Video if this part of Mx. Hernandez's arrest can be viewed here: https://www.youtube.com/watch?v=OLn2iy-ia24&t=1s and was published on June 8, 2020 by *Gothamist*.

240.    Defendant NYPD Member John Doe 98 grabbed Mx. Hernandez's left arm.

241.    Mx. Hernandez was holding the NLG-NYC Attestation of Essential Services in their right hand.

242.    Mx. Hernandez repeatedly informed the officers around them that they were an essential worker, and tried to show the officers the paperwork.

243.    Defendant NYPD Member John Doe 99, who seemed to be trying to knock the papers out of their hands, grabbed Mx. Hernandez's right arm.

244.    Some of the papers dropped.

245.    Then, without warning, Defendant Doe 99, who had grabbed Mx. Hernandez's right arm, roughly threw them from a full standing position, face-first onto the ground.

246.    Mx. Hernandez's right shoulder hit the ground first, then their right arm and then rest of their body, causing pain and bruises on Mx. Hernandez's right shoulder, arm, and knee.

247.    The throw also caused some of Mx. Hernandez's property to fall out of their fanny pack.

248.    As Mx. Hernandez was face-down on the ground, Defendant Doe 98 and/or 99 then placed excessively tight plastic flex-cuffs on Mx. Hernandez's wrists, causing pain and bruises on Mx. Hernandez's wrists.

249.    Mx. Hernandez repeatedly told Defendants Does 97-99 they were an essential worker and attempted to show them the NLG-NYC Attestation of Essential Services they had in their hand.

250.    Nevertheless, Defendants Does 97-99 detained and arrested Mx. Hernandez without consent, probable cause, or lawful justification.

251.    After a period of time, NYPD members gathered up some of the Legal Observers — eventually including Plaintiffs Hernandez, Santus, Zech, Horton, Gilbert, Mills-Dirlam, Chiel, and Leinbach — that had been arrested, and placed first in a group forced to sit on the ground, then in two lines facing a car and houses along Brook Avenue.

252.    Defendant NYPD Member Jane Doe 100 then unlawfully searched Mx. Hernandez's person and seized Mx. Hernandez's property, including, but not limited to, Mx. Hernandez's identification, which NYPD members took a photograph of and/or otherwise documented information from.

253.    Defendant NYPD Supervisor John Doe 101 then told the Legal Observers, in substance, that they would be released and would have "one chance" to "go home."

254.    He also said, in substance, that they would not get another chance.

255.     Ms. Mills-Dirlam asked, in substance, "What if we don't?"

256.     Another Legal Observer also responded with words to the effect of, "because you don't want us to see what you're doing here right now?"

257.     Defendant NYPD Supervisor John Doe 101 replied to both of them, in substance, "You know, never mind, don't let them go."

258.     After an extended period of time, during which time Mx. Hernandez remained in handcuffs, Doe 101 cut off the handcuffs and released Mx. Hernandez.

259.     At some point during Mx. Hernandez's detention, officers removed their mask, and did not replace it.

260.     NYPD Member John or Jane Doe 102 then told Mx. Hernandez words to the effect that they should go home and they would not get a second chance.

261.     Defendants NYPD Strategic Response Group Officers John and/or Jane Does 103-106 later told Mx. Hernandez to move down the block.

262.     Mx. Hernandez continues to experience increased anxiety and fear as a result of this incident.

263.     Because of that fear and anxiety, Mx. Hernandez has acted as a Legal Observer at fewer protests since June 4, 2020.

### Plaintiff Jonathan Davis

264.     Plaintiff Jonathan Davis is a 68-year-old graduate of Rutgers Law School, who works as a safety environmental consultant.

265.    At all times relevant herein, Mr. Davis was clearly identified as an NLG-NYC

Legal Observer, in that Mr. Davis was wearing a bright neon green hat, as well as a badge on a

lanyard, which prominently features the NLG-NYC logo and the words "LEGAL OBSERVER."

266.    At all times relevant to herein, Mr. Davis had an NLG-NYC Attestation of

Essential Services printed on NLG-NYC letterhead in his possession.

267.    Prior to 8 p.m., Mr. Davis observed NYPD members kettle protesters at Mott

Haven.

268.    Mr. Davis heard a dispersal order — after the group of protesters and legal

observers were fully blocked in and unable to leave — at approximately 7:58 p.m.

269.    Nobody could have complied with that order because of the kettle.

270.    Believing that police were about to make mass arrests, Mr. Davis started to write

down the names and birthdates of the trapped demonstrators.

271.    As Mr. Davis attempted to perform this work as a Legal Observer, Defendants

Rabel and Does 107-108 rear-cuffed him with plastic flex-cuffs and led him to the side of 136th

Street near Brown Place.

272.    Mr. Davis was among the first five or six people near him to be placed in flex

cuffs.

273.    Defendants Does 107 and/or 108 unlawfully searched Mr. Davis's person and

bag.

274.    Mr. Davis repeatedly told the many NYPD members near him, including

Defendants Rabel and Does 107-108, that he was a Legal Observer, that he was an essential

worker, and that he had documentation with him to that effect.

275.    About five minutes about being zip-tied and forced to stand in the street, Mr. Davis began to feel dizzy.

276.    Mr. Davis continued to repeat that he was a Legal Observer and that he had paperwork from the National Lawyers Guild with him.

277.    He attempted to explain this to every white-shirt that walked by for approximately 20-30 minutes.

278.    After that approximately 20-30 minutes, a NYPD Deputy Chief believed to be John D'Adamo, or possibly a male NYPD Chief or Deputy Chief John Doe 109 who was standing next to a NYPD supervisor in a uniform wearing a white shirt and the name "D'Adamo" on his nameplate, approached Mr. Davis, who was still cuffed and in Rabel's custody, and instructed Rabel to "cut him loose."

279.    Within the hour, Defendant Doe 110 threatened Mr. Davis with re-arrest for being present and continuing legal observing.

280.    In addition to other injuries, this experience was traumatic for Mr. Davis, and he now has an increased fear of the police.

**Plaintiff Sarah Mills-Dirlam**

281.    Plaintiff Sarah Mills-Dirlam is an attorney, who works for a continuing legal education provider, where she manages all of the programming.

282.    At all times relevant herein, Ms. Mills-Dirlam was clearly identified as an NLG-NYC Legal Observer, in that she was wearing a bright neon green hat, which prominently features the NLG-NYC logo and the words "LEGAL OBSERVER."

283.    At all times relevant herein, Ms. Mills-Dirlam had an NLG-NYC Attestation of Essential Services printed on NLG-NYC letterhead in her possession.

284.    As described above, Ms. Mills-Dirlam was partnered with Mx. Hernandez prior to the Mott Haven Kettle.

285.    Later, and after the Mott Haven Kettle was formed, as Ms. Mills-Dirlam was attempting to collect the names of arrestees, Defendant NYPD Supervisor John Doe 111, a white, male NYPD supervisor in an NYPD uniform with a white shirt, grabbed Ms. Mills-Dirlam from behind, hard, by her shoulders.

286.    He then grabbed Ms. Mills-Dirlam by the wrists and moved her off the sidewalk, to the center of the street.

287.    He then restrained Ms. Mills-Dirlam's arms behind her back with plastic flex cuffs.

288.    Defendant Doe 111 tore Ms. Mills-Dirlam's Legal Observer notes, which are privileged under the Attorney Work Product Doctrine, from Ms. Mills-Dirlam, and threw them on the ground.

289.    Ms. Mills-Dirlam said, in substance, "That's privileged attorney work product."

290.    Ms. Mills-Dirlam's notes were not retrieved or returned.

291.    Defendant Doe 111 led Ms. Mills-Dirlam's down a hill and pushed her to her knees.

292.    Defendant NYPD Member John Doe 112 later took custody of Ms. Mills-Dirlam.

293.    Defendant Doe 112 put Ms. Mills Dirlam in a line with a large number of other Legal Observers, all wearing neon green hats.

294.    Defendant NYPD Member Jane Doe 113, a female wearing a NYPD uniform, searched and seized Ms. Mills-Dirlam and seized Ms. Mills-Dirlam's identification, which Doe 84 or another NYPD member took a photograph of and/or otherwise documented information from.

295.    Defendant NYPD Supervisor John Doe 114 turned Ms. Mills-Dirlam around to face him when he gave the "one chance" warning described above.

296.    After an extended period of time, Defendant NYPD Member John Doe 115 released Ms. Mills-Dirlam from the flex cuffs and from police custody.

297.    In the week following the incident, NYPD attorneys and attorneys from the Bronx County DA both visited Ms. Mills-Dirlam's LinkedIn profile.

298.    Because of this incident, Ms. Mills-Dirlam has not acted as a Legal Observer since and she is afraid to go to large protests.

**Plaintiff Natalie Baker**

299.    Plaintiff Natalie Baker is a graduate of the City University of New York School of Law.

300.    Ms. Baker did not have her neon green hat that day, but did have the badge and lanyard clearly identifying her as a Legal Observer.

301.    At or around 7:16 p.m., an NYPD Community Affairs officer approached Ms. Baker.

302.    The Community Affairs Officer repeatedly asked questions to the effect of, "have you advised the protesters to disperse before 8:00 p.m.?"

48

303.    Ms. Baker informed the officer that Legal Observers do not provide legal advice, and their only role at a protest is to observe and document what happens.

304.    The officer continuously repeated the same question, acting as if she had not heard the answers.

305.    This repetitive questioning lasted for between 3 and 5 minutes.

306.    After the Mott Haven Kettle formed, Ms. Baker did not hear a dispersal order — but she could not have left if she did.

307.    There were no names, shields, shield numbers, or other identifying information Ms. Baker could see on the officers blocking 136th Street.

308.    Ms. Baker began asking those officers for their badge numbers at approximately 8:01 p.m.

309.    Only one officer responded at all, by saying "323."

310.    Every other officer did not even acknowledge the question — even when Ms. Baker stated she was a Legal Observer and showed her badge.

311.    Ms. Baker took notes as she observed NYPD members trap protesters, and then push and hit the trapped protesters, including with their batons.

312.    Ms. Baker was crouched down on the sidewalk attempting to write down the names of some younger people who she thought might be arrested.

313.    Without warning, Defendant NYPD Member John Doe 116, a male, uniformed NYPD member, grabbed Ms. Baker from behind.

314.     Defendant Doe 116 pushed Ms. Baker's purple notebook in which she had been taking Legal Observer notes out of her hands while pulling her arms behind her.

315.    Defendant Doe 116 then cuffed Ms. Baker with plastic zip ties, and pushed her toward a group of handcuffed arrestees.

316.    Defendant Doe 116 left Ms. Baker's notebook, in which she had been taking Legal Observer notes, on the ground where Doe 116 had first grabbed her.

317.    Ms. Baker was forced to sit in the road with other arrestees for approximately 15 minutes before she and the other legal observers were lined up, as described above.

318.    NYPD Member John Doe 117 unlawfully searched Ms. Baker's person and seized more of her property, to wit, Ms. Baker's identification, which NYPD members took a photograph of and/or otherwise documented information from.

319.    At Ms. Baker's request, Doe 117 retrieved her notebook from the location at which Doe 82 had first grabbed her.

320.    After an extended period of time, during which Ms. Baker remained in handcuffs, NYPD Member John or Jane Doe 118 cut off the handcuffs and released her.

321.    Later, as Ms. Baker was attempting to record the names of arrestees who were being loaded into a van from a safe distance away, NYPD Member John Doe 119 shouted angrily, ordering Ms. Baker to "MOVE BACK!" until she was at least 15' away from the people being placed into the van – a distance too far to communicate with them to get their names.

322.    Later, NYPD Members John  and Jane Does 120-126 started instructing Ms. Baker and other Legal Observers to move back along the sidewalk, and then walked toward Ms. Baker and the other LO's with their arms out, forcing them back as they advanced, until they were so far away that they could no longer interact with the detained people.

323.    Ms. Baker suffered worsened depression and anxiety because of this incident.

**Plaintiff Ethan Chiel**

324.     Plaintiff Ethan Chiel is a law student at CUNY School of Law.

325.     At all times relevant herein, Mr. Chiel was clearly identified as a NLG-NYC Legal Observer, in that he was wearing a bright neon green hat, as well as a badge on a lanyard, which prominently feature the NLG-NYC logo and the words "LEGAL OBSERVER."

326.     At all times relevant herein, Mr. Chiel had an NLG-NYC Attestation of Essential Services printed on NLG-NYC letterhead in Claimant's possession.

327.     As Mr. Chiel attempted to perform his work as a Legal Observer by recording the names of arrestees, Defendant NYPD Supervisor John Doe 127, a white, male NYPD supervisor with reddish hair in a NYPD uniform with a white shirt, grabbed Mr. Chiel's arm and told him to get back, which was not physically possible at that time.

328.     When Mr. Chiel responded something to the effect of, "I'm a Legal Observer," Defendant Supervisor Doe 127 began grabbing at Mr. Chiel's Legal Observer notebook, and in the process tore a number of pages out, including all of Mr. Chiel's privileged work product notes contained in the notebook.

329.     Defendant Doe 127 and at least 3 Defendant John Doe NYPD members – Does 128-130 – then grabbed Mr. Chiel and began yanking him, knocking his notebook out of his hand.

330.     Defendant Does 127-130 pulled Mr. Chiel towards them and through the police line, and threw him onto the ground, causing a 1.5-2 inch cut on Mr. Chiel's left elbow and injury to his right leg.

331.     One of Defendant Does 127-130 rear-cuffed Mr. Chiel with tight, plastic flex-cuffs.

332.     Defendant Doe 131 then unlawfully searched Mr. Chiel's person and seized Claimant's property, including, but not limited to, Claimant's identification, which Doe 131 or another NYPD member took a photograph of and/or otherwise documented information from.

333.     After an extended period of time, during which Claimant remained in handcuffs, a NYPD member, Defendant Doe 132, cut off the handcuffs and released Claimant.

334.     Defendant Doe 132 then told Mr. Chiel in sum that he should leave the area.

335.     Another NYPD member also told Mr. Chiel that he had to leave the area.

336.     Mr. Chiel walked back to where he had been arrested and found his notebook, but the privileged work product notes that had been torn out were missing.

337.     In addition to the injuries discussed above, Mr. Chiel suffered additional injuries, including increased anxiety.

## **Plaintiff Kyla Raskin**

338.     Plaintiff Kyla Raskin is a law student at the City University of New York School of Law.

339.     At all times relevant herein, Ms. Raskin was clearly identified as a NLG-NYC Legal Observer, in that she was wearing a bright neon green hat, as well as a badge on a lanyard, which prominently feature the NLG-NYC logo and the words "LEGAL OBSERVER."

340.     At all times relevant to Ms. Raskin's claim, she had an NLG-NYC Attestation of Essential Services printed on NLG-NYC letterhead in her possession.

341.     Earlier in the evening, an NYPD member in an unmarked vehicle put his head out the car window and said in sum and substance, "Legal Observer, do you have any Molotov cocktails?"

342.     Later, NYPD members trapped Ms. Raskin in the Mott Haven Kettle, and began violently arresting people near Ms. Raskin.

343.     As Ms. Raskin attempted to write down the names of arrestees, Defendant NYPD Member John Doe 133, a male officer in a blue NYPD uniform with a riot gear helmet on, and other NYPD members, pushed Ms. Raskin and others down the block, away from the violent arrests.

344.     Ms. Raskin suffered bruising to the back of her arm from being pushed.

345.     Because Defendant Doe 133 and NYPD members forced Ms. Raskin away from the vicinity of the arrests, Ms. Raskin was hindered in her ability to perform her work as a Legal Observer.

346.     This incident effected Ms. Raskin's feelings of safety, and made it difficult to leave her apartment or attend protests.

**Plaintiff David Holton**

347.     Plaintiff David Holton is a law student at the City University of New York Law School.

348.     At all times relevant herein, Mr. Holton was clearly identified as a NLG-NYC Legal Observer, in that he was wearing a bright neon green hat, as well as a badge on a lanyard, which prominently feature the NLG-NYC logo and the words "LEGAL OBSERVER."

349.     At all times relevant to herein, Mr. Holton had an NLG-NYC Attestation of Essential Services printed on NLG-NYC letterhead in Claimant's possession.

350.     Once the Mott Haven Kettle formed, without warning, Defendant NYPD

Supervisor John Doe 134 (a white-shirt, who was a white man in, upon information and belief,

his 40's) grabbed Mr. Holton and pulled him into a crowd of police.

351.     Defendant Doe 134 put Mr. Holton into a headlock.

352.     Defendant Doe 134 knocked Mr. Holton's NLG-NYC Legal Observer hat off his

head.

353.     Defendant NYPD Member John or Jane Doe 135 then put excessively tight,

plastic handcuffs on Mr. Holton.

354.     Defendant NYPD Member John or Jane Doe 136 then seized Mr. Holton's phone

and Legal Observer notes.

355.     Mr. Holton's phone was eventually returned.

356.     Defendant NYPD Member John or Jane Doe 137 later came over to Mr. Holton

and moved Mr. Holton to another location within police custody.

357.     Eventually, Defendant Doe 158 removed Mr. Holton's handcuffs and released

him.

358.     Mr. Holton eventually retrieved his Legal Observer hat and notes from non-

NYPD members who had found them.

359.     Eventually, NYPD members told Mr. Holton that he had to leave the area.

360.     He was thus prevented from continuing to engage in acting as a Legal Observer.

**Plaintiff Rafael-Lev E. Gilbert**

361.    Plaintiff Rafael-Lev E. Gilbert is a law student at the City University of New York School of Law.

362.    At all times relevant herein Mr. Gilbert was clearly identified as a NLG-NYC Legal Observer, in that he was wearing a bright neon green hat, as well as a badge on a lanyard, which prominently feature the NLG-NYC logo and the words "LEGAL OBSERVER."

363.    At all times relevant to herein, Mr. Gilbert had an NLG-NYC Attestation of Essential Services printed on NLG-NYC letterhead in Claimant's possession.

364.    Mr. Gilbert was trapped in the Mott Haven Kettle.

365.    Around 8 p.m., Defendant NYPD Member John Doe 138, a male uniformed officer, grabbed Mr. Gilbert by his right shoulder and right harm, twisted his right arm behind his back, shoved Mr. Gilbert hard into the side of a parked car, and held his head against the car.

366.    Defendant Doe 138 then applied plastic handcuffs to Mr. Gilbert's wrists with extreme tightness, such that Mr. Gilbert soon lost feeling in his hands and he suffered soreness in his wrists.

367.    NYPD members took Mr. Gilbert, whose backpack was hanging from his cuffed hands, to an area with other arrestees, where NYPD members pushed Mr. Gilbert into a seated position.

368.    After approximately twenty minutes, NYPD members walked Mr. Gilbert away from the arrestees and held him against a parked car.

369.    Mr. Gilbert was then taken and forced into a sitting position in the street with a number of other arrestees (including both Legal Observers and non-Legal Observers).

370.    At that point, an unknown officer said, in sum and substance, "is that all the green hats?"

371.     NYPD members, including Defendant Doe 139, unlawfully searched Mr. Gilbert's person and seized Mr. Gilbert's property, including, but not limited to, by reaching into Mr. Gilbert's pants pocket and removing his identification, which NYPD members took a photograph of and/or otherwise documented information from.

372.     After an extended period of time, during which Mr. Gilbert remained in handcuffs, Doe 139 cut off the handcuffs and released him.

373.     The officers instructed Mr. Gilbert to stay away from the seated protesters — making it impossible to properly perform the tasks he was supposed to as a Legal Observer.

374.     Following this incident, Mr. Gilbert had trouble sleeping and increased anxiety, which caused him to miss about one week of law school.

375.     Mr. Gilbert has gone to far fewer protests since this incident.

**Plaintiff August Leinbach**

376.     Plaintiff August Leinbach is a law student at Columbia Law School.

377.     At all times relevant herein, Mr. Leinbach was clearly identified as a NLG-NYC Legal Observer, in that he was wearing a bright neon green hat, as well as a badge on a lanyard, which prominently feature the NLG-NYC logo and the words "LEGAL OBSERVER."

378.     At all times relevant herein, Mr. Leinbach had an NLG-NYC Attestation of Essential Services printed on NLG-NYC letterhead in his possession.

379.     As Mr. Leinbach was performing his duties as a Legal Observer, Defendant NYPD Supervisor First Name Unknown ("FNU") Hyland, a white male in an NYPD uniform with a white shirt, repeatedly shoved Mr. Leinbach and told him to leave.

380.     Defendant Hyland and/or NYPD Member John Doe 148 then pushed Mr. Leinbach up against a car and applied plastic handcuffs to Mr. Leinbach's wrists with extreme tightness.

381.     In the process, Defendant Hyland and/or Doe 140 either dropped or caused Mr. Leinbach's Legal Observer notes to fall to the sidewalk, and made no attempt to recover them for him - though Mr. Leinbach was able to locate his notes after he was released from custody later.

382.     Mr. Leinbach repeatedly told the NYPD members present that he was a Legal Observer, and that he was an essential worker.

383.     Eventually, Mr. Leinbach was lined up with a number of other Legal Observers, as described above.

384.     NYPD members, including Defendant Doe 141, unlawfully searched Mr. Leinbach's person and seized his property, including, but not limited to, Mr. Leinbach's identification and debit card, which NYPD members took a photograph of and/or otherwise documented information from.

385.     After an extended period of time, during which Mr. Leinbach remained in handcuffs, Defendant Doe 142 cut off the handcuffs and released him.

386.     Mr. Leinbach know feels much more nervous around police officers, particularly at protests.

**Plaintiff Roxanne Zech**

387.     Plaintiff Roxanne Zech is law student at CUNY School of Law.

388.     At all times relevant herein, Plaintiff Zech was clearly identified as a NLG-NYC Legal Observer, in that Plaintiff Zech was wearing a bright neon green hat, as well as a badge on

a lanyard, which prominently feature the NLG-NYC logo and the words "LEGAL

OBSERVER."

389.    At all times relevant herein, Plaintiff Zech had an NLG-NYC Attestation of

Essential Services printed on NLG-NYC letterhead in Claimant's possession.

390.    While Defendant Doe 143 shoved Plaintiff Zech's neck and head onto a car,

Defendant Doe 144 roughly grabbed and twisted Plaintiff Zech's arms.

391.    Plaintiff Zech yelled out in pain.

392.    An officer, upon information and belief, one of Does 144 or 145, said in sum and

substance, "your arm is being twisted, that's why it hurts."

393.    Defendants Does 144 and 145 put Plaintiff Zech's wrists in plastic flex-cuffs that

were excessively tight.

394.    In the course of grabbing Plaintiff Zech and shoving them against the car in that

manner, one or more of Defendants Does 143-145 caused Plaintiff Zech's notebook containing

their Legal Observer notes to fall to the ground.

395.    Plaintiff Zech attempted to tell officers that they were a Legal Observer, and that

the Mayor had confirmed that Legal Observers were essential workers permitted to be out past

curfew.

396.    However, one officer dismissively told them, "good for you."

397.    Eventually, Plaintiff Zech was brought into the Legal Observer line-up described

above.

398.    NYPD members, including NYPD Member John or Jane Doe 146, unlawfully

searched Plaintiff Zech's person and seized their property, including, but not limited to, Plaintiff

Zech's identification, which NYPD members took a photograph of and/or otherwise documented information from.

399.    After an extended period of time, during which Plaintiff Zech remained in handcuffs, NYPD Member John Doe 146 cut off the handcuffs and released them.

400.    Defendant Doe 146 told Plaintiff Zech in substance that the Legal Observers could not stay there and were to walk in the opposite direction, leave the vicinity, and not come back.

401.    Since this incident, Plaintiff Zech's anxiety has greatly increased, and they experienced trouble sleeping and eating.

**Plaintiff Jalen Matney**

402.    Plaintiff Jalen Matney is a graduate of — and at the time at issue, was a law student at — the City University of New York School of Law.

403.    At all times relevant herein, Mr. Matney was clearly identified as a NLG-NYC Legal Observer, in that he was wearing a bright neon green hat, as well as a badge on a lanyard, which prominently feature the NLG-NYC logo and the words "LEGAL OBSERVER."

404.    At all times relevant to Mr. Matney's claim, he had an NLG-NYC Attestation of Essential Services printed on NLG-NYC letterhead in his possession.

405.    Mr. Matney was trapped in the Mott Haven kettle.

406.    Mr. Matney was initially grabbed without warning by a blue-uniformed NYPD Member , Defendant John Doe 147, and possibly another or other officers.

407.    Defendant Doe 147 and/or Defendants NYPD Member s John or Jane Does 148-149 pulled Mr. Matney's hands behind his back and began grabbing onto Mr. Matney.

408.     Defendant NYPD Member John Doe 149, a blue-shirted, male officer, punched Mr. Matney in the face as Defendants NYPD Members John Does 150, 151, and/or others threw Mr. Matney to the ground and stomped on Mr. Matney's legs, calves, and back.

409.     In the process, Mr. Matney's NLG-NYC Legal Observer hat and his facemask were knocked off.

410.     One or more of Defendant Does 147-151 applied plastic handcuffs to Mr. Matney's wrists with extreme tightness, such that he felt his left hand begin to go numb after a few minutes.

411.     One or more of Defendant Does 82-86 yelled at Mr. Matney to "get the fuck up right now!"

412.     When Mr. Matney asked, "how?," one of Defendant Does 147-151 quickly jerked Mr. Matney up by the arms and into the street, pulled Mr. Matney by the arm down the hill, and pushed him toward the ground in an area wither other handcuffed arrestees.

413.     Although Mr. Matney complained about the excessive tightness of the handcuffs to NYPD members, they did not take any steps to alleviate the excessive tightness of the handcuffs until after he was forced to endure the excessively tight handcuffs for an extended period of time.

414.     Defendant NYPD Member John Doe 152 unlawfully searched Mr. Matney's person and seized his property, including, but not limited to, his identification, which NYPD members took a photograph of and/or otherwise documented information from.

415.     After an extended period of time, during which Mr. Matney remained in handcuffs, a NYPD member, Doe 153, cut off the handcuffs and released him.

416.    After Mr. Matney's release, he retrieved his NLG-NYC Legal Observer hat from the street.

417.    NYPD members continued to interfere with Mr. Matney's Legal Observing duties.

418.    Defendant NYPD Member John or Jane Doe 154 directed Mr. Matney to step away from protestors that were cuffed and kneeling as he tried to lean in to get their names.

419.    Defendant Doe 155 ordered Mr. Matney to stop his legal observing activities and leave because it was past curfew.

420.    Defendants John Does 156 and 157, and possibly other NYPD members, ordered Claimant to walk to the end of the block away from the protestors.

421.    This incident traumatized Mr. Matney, who as acted as a Legal Observer far fewer protests afterwards.

**H.  <u>Defendants' de Blasio's, Shea's, Monahan's, Hart's, and Lehr's Ratifications of their Subordinates' Misconduct and Failures to Monitor, Supervise, Monitor, and Discipline NYPD Members Regarding the NYPD FTP4 Protest Response and the Legal Observer Arrests.</u>**

422.    Although defendants City, Shea, Monahan, Hart, Lehr and other policymakers actually knew, or should have known, that NYPD members were engaging in or had engaged in the unconstitutional and unlawful conduct complained of herein, they failed to monitor, supervise, and/or discipline NYPD members who directed, engaged, or observed such conduct.

423.    For example, Defendants de Blasio and Shea made public statements on social media and in the media indicating they had knowledge of events related to violence and mass arrests at the protests as they were unfolding, and, of course, a wealth of video and other evidence was widely available online.

424.    With respect to Plaintiffs in particular, images of NYPD officers arresting NLG-NYC Legal Observers began to circulate online almost immediately. For example, on June 5, 2020, *Gothamist* published a photograph of Plaintiff Zech being shoved against a car, under arrest, clearly wearing her bright green NLG-NYC Legal Observer hat [23]

425.    On June 7, 2020, the NLG-NYC sent a letter regarding "Legal Observer Targeting and Detentions" to Defendant Shea, copying a number of other officials, including the Defendants de Blasio and Hart; the New York City Corporation Counsel; the New York City Public Advocate; and the New York State Attorney General. Plaintiffs incorporate the June 7, 2020 NLG-NYC letter by reference, and a copy is attached hereto.[24]

426.    In that June 7, 2020 letter, the NLG-NYC "condemn[ed]" the NYPD's "unlawful targeting and detention of…trained and clearly identified" NLG-NYC Legal Observers on June 4, 2020 in the Bronx.

427.    The NLG-NYC also identified the NYPD Legal Bureau attorney and described how he verbally authorized the arrests of NLG-NYC Legal Observers and pointed toward NLG-NYC Legal Observers, after which NYPD officers grabbed and handcuffed NLG-NYC Legal Observers.

428.    Finally, the NLG-NYC letter demanded that the NYPD: "(1) remind all NYPD officers of the status and role of Legal Observers via a FINEST message and citywide department announcements to be made at roll calls in the presence of all working officers; and (2) discipline those officers, including the NYPD Legal Bureau officers present, who supervised,

---

[23] *See, e.g.,* Jake Offenhartz, Nick Pinto, and Gwynne Hogan, "NYPD's Ambush of Peaceful Bronx Protesters Was 'Executed Nearly Flawlessly,' City Leaders Agree," *Gothamist* (June 5, 2020) available online at https://gothamist.com/news/nypds-ambush-of-peaceful-bronx-protesters-was-executed-nearly-flawlessly-city-leaders-agree.
[24] A copy of the letter is available online at: https://www.scribd.com/document/464875743/2020-6-7-Nlgnyc-Lo-Letter-Final-Ocr-730pm.

and were otherwise involved in, detaining and searching the LO's and violating the confidentiality of their LO notes."

429.   The June 7, 2020 NLG-NYC letter resulted in press coverage by *Gothamist*[25] and *The New York Law Journal*[26] – but no response to the NLG-NYC from Defendants Shea, Hart, or anyone else.

430.   Upon information and belief, to this date, there has been no response from any of the Defendants, or any representative of Defendant City, to the June 7, 2020 NLG-NYC letter.

431.   On June 17, 2020, the New York City Bar Association (the "City Bar") issued a "Statement on Detention of Legal Observers" (the "City Bar Statement"). A copy of the City Bar Statement is attached hereto and incorporated by reference.[27]

432.   In the City Bar Statement, the City Bar said it was "gravely concerned by recent reports in the United States of concerted efforts by police forces to target legal observers", focusing on the facts surrounding the June 4, 2020 detentions and arrests of the NLG-NYC LOs in the Bronx while noting that "[t]he targeting of legal observers by police is also occurring outside New York". The City Bar Statement concluded:

> The fact that legal observers have become targets for the police indicates that policing strategies in these communities have failed. First, these attacks [against Legal Observers] suggest a failure to adequately train police serving on crowd control details to identify legal observers who are monitoring protests as non-targets.  Second, the systematic targeting of legal observers contributes to a growing concern that recent police actions are entirely disproportionate to officers' narrow duties to maintain security while honoring the First Amendment rights of protesters.  Third, and most egregiously, the

[25] *See* Jake Offenhartz, "'Round Up The Green Hats': NYPD Accused Of Deliberately Targeting Legal Observers In Brutal Bronx Mass Arrest", *Gothamist* (June 8, 2020), available online at  https://gothamist.com/news/round-green-hats-nypd-accused-deliberately-targeting-legal-observers-brutal-bronx-mass-arrest.
[26] *See* Jane Wester, "Letter Demands NYPD Discipline After Legal Observers Were Detained, Illegally Searched During Bronx Protest," *The New York Law Journal* (June 8, 2020), available online at https://www.law.com/newyorklawjournal/2020/06/08/letter-demands-nypd-discipline-after-legal-observers-were-detained-illegally-searched-during-bronx-protest/.
[27] A copy of the Statement on Detention of Legal Observers is also available online at https://www.nycbar.org/media-listing/media/detail/statement-on-detention-of-legal-observers.

reports of police warnings that legal observers are in the area, the subsequent targeting and detention of those observers, and the forced disclosure of privileged material indicates a startling disregard by police forces that their conduct is governed in our society by the rule of law.

The City Bar strongly condemns all attacks on legal observers and urges state and local governments, police chiefs, and police unions both to advise their officers that attacks on legal observers are not tolerated, and also to swiftly investigate any incident involving the detention or use of force against a legal observer, and where warranted, prosecute offenders.  As protests and other demonstrations continue, the City Bar specifically calls on Mayor Bill de Blasio and Police Commissioner Dermot Shea to immediately investigate the incident in the Bronx, and for all officers in the NYPD to be made aware that the consequences of any illegal targeting of legal observers by police will be swift and severe, including appropriate disciplinary charges and criminal prosecution.

433.    The June 17, 2020 City Bar Statement resulted in press coverage *The New York Law Journal*[28] but no response from Defendants Shea, Hart, or anyone else.

434.    Upon information and belief, to this date, there has been no response from any of the Defendants, or any representative of Defendant City, to the June 17, 2020 City Bar Statement.

435.    Each of the 12 Plaintiffs made written statements related to their June 4, 2020 experiences, copies of which are collectively attached hereto and incorporated by reference.

436.    Each Plaintiff provided those written statements to, and made oral statements to, the New York Civilian Complaint Review Board ("CCRB") and the Office of the Attorney General ("OAG") as part of those agencies' investigations into the events of June 4, 2020 and the Summer 2020 Protests.

---

[28] *See* Jane Wester, "City Bar Calls For Investigation Following Arrests of Legal Observers During Bronx Protests", *The New York Law Journal* (June 17, 2020), available online at https://www.law.com/newyorklawjournal/2020/06/17/city-bar-calls-for-investigation-following-arrests-of-legal-observers-during-bronx-protests/.

437.    High-level policymakers for Defendant City, including Defendants de Blasio,

Shea, Monahan, and Hart, knew that those investigations were underway as early as June of 2020

– yet, upon information and belief, they have not undertaken their own investigations, and have

not

438.    For example, during Defendant Shea's June 22, 2020 testimony in the OAG's

investigation regarding the NYPD's policing of the Summer 2020 Protests, including the events

of June 4, 2020, the following exchange occurred[29]:

**AG James**: There are also Legal Observers who were arrested as a result of this
protest. Is there not a directive from the mayor and or yourself to police officers
that legal observers and essential workers should not be arrested after the curfew?

**Commissioner Shea**: Yeah, I would have to see how you're defining Legal
Observers, I'm not sure what you're referring to there.

**AG James**: There were individuals who were clearly, they had clearly marked on
their caps, as well as on their shirts, that they were Legal Observers. Nonetheless
there is video, and some testified last week, that they were arrested, nonetheless.

**Commissioner Shea**: Right, I would just point out to the board here that having a
shirt or a hat that says Legal Observer, does not mean that person is an attorney,
does that not mean [sic] that they're actually performing any legal function. We
go on the facts in front of us, and we had incidents of many people committing
crimes and violations, and we responded to those facts.

**AG James**: So do you ever interview the individuals that you arrest to determine
whether or not in fact they are acting as a Legal Observer?

**Commissioner Shea**: We have conversations with people literally non-stop
throughout the protest, and certainly during the arrest process, but that's after their
rights are read to them so we will question them if it's appropriate.

---

[29] *See* "Attorney General James Questions NYPD Commissioner Shea in Ongoing Investigation into Interactions
Between Police and the Public*"* at Minute 44:58 – 46:30 *(*June 22, 2020), available online at
https://ag.ny.gov/NYPDtestimony; *see also* Jane Wester, "NYPD Commissioner Testifies Before AG James on
Protest Response, Treatment of Legal Observers," *The New York Law Journal* (June 22, 2020), available online at
https://www.law.com/newyorklawjournal/2020/06/22/nypd-commissioner-testifies-before-ag-james-on-protest-
response-treatment-of-legal-observers/.

439.    On September 30, 2020, HRW published the HRW Report.

440.    On October 2, 2020, Defendant de Blasio appeared on WNYC's *The Brian Lehrer Show: Ask the Mayor*, and the following exchange occurred among Brian Lehrer, Plaintiff David Holton, and Defendant de Blasio:

> **Brian Lehrer:** David in White Plains. You're on WNYC with the mayor. Hello, David.
>
> **David Holton:** Hello, good morning. My name is David. I'm a law student in Queens. I'm a legal observer for the National Lawyers Guild. I'm calling about a protest which I observed on June 4th in the Bronx when a large number of protesters were arrested. Also, all the legal observers were arrested at the same time. We've been calling this the Mott Haven Kettle. My question is related to the curfew. At that time, you'll recall there was an 8:00 PM curfew. We, legal observers, had documentation from the mayor's office, saying that we were essential workers. Now the NYPD is claiming that we were not essential workers and were thus out past curfew. My question is, who's right there? Were we essential workers or not?
>
> **Mayor de Blasio:** Yes, you were. With all due respect to NYPD, the NYPD is wrong on this one. Legal observers-- Look, as someone who's protested a lot myself over the years, there is a sacred role played by legal advisors. Excuse me, legal observers. They need to be treated with deference. As you said, very important point you made, David. You had documentation proving you were legal observers. That is an essential role. That is part of how we protect our democratic rights.[30]
>
> If someone didn't have documentation, if their status was unclear, I can understand there could be some confusion, but a legal observer doing what a legal observer is supposed to identify themselves and clarify their role, of course, they're not supposed to be arrested. If, and God forbid someone committed a specific crime, that's a different matter, obviously. If you're talking about their role, observing, protecting people's rights, of course, they're essential workers. Of course, they're not supposed to be arrested.

441.    The DOI Report, which was completed and published in December of 2020, acknowledged Plaintiffs' arrests and other misconduct committed against them at the FTP4

---

[30] *The Brian Lehrer Show: Ask the Mayor: 'Testing, Testing, Testing'*, WNYC, Oct. 2, 2020, available at https://www.wnyc.org/story/ask-mayor-covid-19-testing (14:30-16:30).

Protest, and that a number of Defendants, including Defendants de Blasio, Monahan, and Rice, were aware of Plaintiffs' arrests and misconduct committed against them at the FTP4 Protest. *See, e.g.,* DOI Report pp. 21, 41.

442.   For example, according to the December 2020 DOI Report at pp. 43-44, Defendant Monahan stated that "the NYPD Legal Bureau" – upon information and belief, Defendant Rice – "made the determination authorizing the arrests of" Plaintiffs and that when Defendant Monahan learned of the arrests, he claimed, "he ordered their release":

> "*Legal Observers, Medics, and Journalists*. Numerous media reports, along with reports and letters from nongovernmental organizations, noted detentions and arrests of legal observers, medical volunteers, and journalists during the Floyd protests. While not the only instance of alleged interference with legal observers, the NYPD response at Mott Haven resulted in the detention of legal observers, who were reportedly zip tied and shoved to the street, when police executed mass arrests for curfew violations. The Chief of Department stated during his interview that staff from the NYPD Legal Bureau made the determination authorizing the arrest of the legal observers. He also confirmed that when he learned of the arrests of legal observers, he ordered their release. The President of the National Lawyers Guild wrote letters arguing that the detention of legal observers violated the Patrol Guide and was contrary to assurances from City Hall staff that legal observers, as well as medics, were exempt from the curfew. Elected officials also noted those prior assurances. In its written response, the NYPD stated that legal observers were not within the scope of the Executive Order's "Essential Workers" exemption from the curfew. Nonetheless, the purpose of legal observers is to monitor protests for police activity that may infringe upon the civil rights of protesters."[31]

443.   According to a partial transcript of an interview Defendant Shea gave to the DOI prior to December of 2020, Defendant Shea could not answer whether Legal Observers were exempt from the Curfew Orders.[32]

---

[31] *Id.* at 44.
[32] *See* Margaret Garnett, Commissioner, The City of New York Department of Investigation, *DOI's interviews with New York Police Commissioner Dermot Shea conducted as part of DOI's December 18, 2020, report* ("Shea DOI Interview"), available at https://www1.nyc.gov/assets/doi/oignypd/response/Commissioner_DermotShea.pdf.

444.     For example, in response to a direct question about whether Legal Observers were exempt from the Curfew Orders, Defendant Shea said: "I think that I think that legal observers were mentioned in some of these orders. I can't remember in what context right now. And again, you know, this has caused some confusion. There are exemptions, but it does not exempt illegal conduct."[33]

445.     Then, asked whether Legal Observers "have certain protection at protests, whether or not there is a curfew," Defendant Shea said he "would defer that to the lawyers, both in your house, City Hall, as well as our Legal Bureau" but he could not answer the question.[34]

446.     Although he was "racking [his] brain" he could not say whether there were any NYPD policies in place related to the presence of Legal Observers at events.[35]

447.     When the interviewer posed the same question another way, asking, "Does the NYPD have specific protections for Legal Observers," Defendant Shea again did not answer the question, instead referring to some vague memory of a "situation" he claimed he "had seen", statting: "if there is a situation where they are arrested, what I have seen is, that they are committing violations under the guise of being, whether it is an essential worker or legal observers or something along those lines."[36]

448.     According to a partial transcript of an interview Defendant Monahan gave to the DOI prior to December of 2020, Defendant Monahan repeatedly said that there were no NYPD policies in place regarding Legal Observers and that Legal Observers "had to obey the same laws that everyone else did" and "had no special privilege."[37]

---

[33] *See* Shea DOI Interview pp. 27-28.
[34] *See* Shea DOI Interview p. 35.
[35] *See* Shea DOI Interview p. 54.
[36] *Id.*
[37] *See* Margaret Garnett, Commissioner, The City of New York Department of Investigation, *DOI's interviews with New York Police Chief of Department Terence Monahan conducted as part of DOI's December 18, 2020, report*

449.    According to Defendant Monahan's DOI testimony, "Legal" gave the order to have the Legal Observers arrested, and Plaintiffs – who by then had been arrested and placed in handcuffs - "were going to be arrested" but then Defendant Monahan "made the determination based on past experience that utilizing discretion with Legal Observers would be appropriate" so he "ordered that they all be released."[38]

450.    Additionally, Defendant Monahan testified, he "spoke to the Mayor" at the scene of Plaintiffs' arrests as well as "his" (Defendant de Blasio's) "person on the scene" and then told Defendant de Blasio's "person on the scene" that Defendant Monahan was "going to release all the" Legal Observers.[39]

451.    Defendants' June 4, 2020 mistreatment of Plaintiffs prevented them from performing, and/or interfered with their abilities to perform, their functions as Legal Observers – for example, observing and documenting the police response - at the Mott Haven Protest.

452.    Defendants' June 4, 2020 mistreatment of Plaintiffs prevented them from exercising, and/or interfered with their abilities to exercise, their rights to associate for the purposes of performing the functions of Legal Observers, at the Mott Haven Protest.

453.    And, although most Plaintiffs intend to act as volunteer Legal Observers in the future, Defendants' June 4, 2020 mistreatment of Plaintiffs cast and continues to cast a chill on Plaintiffs' abilities and desires to act as Legal Observers in the future.

454.    As seen above, Defendants de Blasio, Shea, Monahan, Hart, Lehr, and other high-level NYPD policymaking officials knew about Plaintiffs' arrests and other misconduct committed by NYPD members against Plaintiffs as part of the NYPD's crackdown on the FTP4

---

("Monahan DOI Interview"), available at
https://www1.nyc.gov/assets/doi/oignypd/response/ChiefofDepartment_TerenceMonahan.pdf, at pp. 46-47.
[38] *See* Monahan DOI Interview pp. 80-83.
[39] *See* Monahan DOI Interview pp. 78-79.

Protest, but failed properly to train, supervise, investigate, or discipline their subordinates as a result of that knowledge related to the requirements to give fair warning before taking certain enforcement actions such as making an arrest predicated on a purported violation of a dispersal order and probable cause to arrest observers, bystanders, and others who wish to see and/or document police operations in public spaces.

## FIRST CLAIM FOR RELIEF

**Unlawful Seizure / False Arrest**
*Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiffs' Rights Under the Fourth and Fourteenth Amendments to the United States Constitution*

455.    Plaintiffs incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

456.    Defendants did not have probable cause to seize, detain, or arrest Plaintiffs.

457.    Defendants seized Plaintiffs without a written judicial warrant authorizing them to do so.

458.    Defendants' seizure of Plaintiffs was without privilege or lawful justification.

459.    Plaintiffs did not consent and were conscious of the confinement by Defendants.

460.    As a result of Defendants' acts and omissions, Defendants deprived Plaintiffs of their federal, state, and/or other legal rights; caused Plaintiffs bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiffs to expend costs and expenses; and/or otherwise damaged and injured Plaintiffs.

461.    Defendants' unlawful conduct was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

## SECOND CLAIM FOR RELIEF

**Excessive Force**
*Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiffs' Rights Under the*
*Fourth and Fourteenth Amendments to the United States Constitution*

462.     Plaintiffs incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

463.     Defendants' use of force against Plaintiffs was unjustified and objectively unreasonable, taking into consideration the facts and circumstances that confronted Defendants.

464.     As a result of Defendants' acts and omissions, Defendants deprived Plaintiffs of their federal, state, and/or other legal rights; caused Plaintiff bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiffs to expend costs and expenses; and/or otherwise damaged and injured Plaintiffs.

465.     Defendants' unlawful conduct was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

## THIRD CLAIM FOR RELIEF

**For Violations of Plaintiff's First Amendment Rights,**
**Including Under Retaliation and Time/Place/Manner Theories of Liability**
*Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiffs' Rights Under the First*
*and Fourteenth Amendments to the United States Constitution*

466.     Plaintiffs incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

467.     Defendants retaliated against Plaintiffs for engaging in speech and/or conduct protected by the First Amendment.

468.     Defendants engaged in the acts and omissions complained of herein in retaliation for Plaintiffs' protected speech and/or conduct.

469.    Defendants engaged in the acts and omissions complained of herein in order to prevent Plaintiffs from continuing to engage in such protected speech and/or conduct.

470.    Defendants engaged in the acts and omissions complained of herein in order to prevent and/or discourage Plaintiffs from engaging in similar protected conduct in the future.

471.    Additionally, as discussed elsewhere herein, Defendant City designed and/or implemented policies and practices pursuant to which those Defendants who implemented them subjected Plaintiffs to violations of their First Amendment rights.

472.    Upon information and belief, Defendants engaged in the acts and omissions complained of herein with respect to Plaintiffs' First Amendment-based claims—including the related municipal liability claims involving the adoption of policies, practices, and/or customs and/or related failures to train, supervise, and/or discipline—with malice.

473.    Defendants imposed restrictions on Plaintiffs' protected speech and/or conduct that violated Plaintiffs' First Amendment rights, including, but not limited to, in subjecting Plaintiff to excessive force, false arrest, excessive detention, malicious and false prosecution, and in otherwise violating Plaintiff's rights and engaging in the acts and omissions complained of herein.

474.    In addition to being retaliatory, the restrictions Plaintiffs complained of herein that Defendants imposed on Plaintiffs' First Amendment rights to participate in, observe, and/or stand nearby speech, conduct, association, and/or other expressive activities protected by the First Amendment on the streets, were themselves regulations on Plaintiffs' protected conduct that:

   a.  Were viewpoint discriminatory and/or otherwise not content-neutral, and were not necessary, and precisely tailored, to serve compelling governmental interests, and/or were not the least restrictive means readily available to serve

those interests; or, alternately,

b.   Were content-neutral, but lacked narrow tailoring to serve a significant governmental interest, in that they burdened substantially more protected speech and/or conduct than necessary to serve those interests, and/or failed to provide ample alternatives for Plaintiff's protected expression, including in that Plaintiff's abilities to communicate effectively were threatened; and/or

c.   Afforded Defendants unbridled or otherwise inappropriately limited discretion to limit or deny Plaintiff's ability to engage in protected conduct (also raising constitutionally significant Due Process-based vagueness and/or overbreadth concerns); and/or

d.   Amounted to the imposition of strict liability on Plaintiff for engaging in protected speech and/or expression.

475.   As a result of Defendants' acts and omissions, Defendants deprived Plaintiffs of their federal, state, and/or other legal rights; caused Plaintiffs bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiffs to expend costs and expenses; and/or otherwise damaged and injured Plaintiffs.

476.   Defendants' unlawful conduct was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

## FOURTH CLAIM FOR RELIEF

### Due Process
***Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiffs' Rights Protected Under the Fifth and Fourteenth Amendments to the United States Constitution***

206.   Plaintiffs incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

207.   As described above, Defendants enforced the Curfew Orders in a manner that rendered them constitutionally void for vagueness and/or overbroad, such that their enforcement against Plaintiffs violated their Due Process rights, in that Defendants' enforcement in

connection with those offenses failed to provide and/or reflected the absence of adequately clear standards to guide police officials' extremely broad discretion to arrest anyone at their whim, based on *ad hoc* determinations, without fair warning to Plaintiffs.

208.    As a result of Defendants' acts and omissions, Defendants deprived Plaintiffs of their federal, state, and/or other legal rights; caused Plaintiffs bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiffs to expend costs and expenses; and/or otherwise damaged and injured Plaintiffs.

209.    Defendants' unlawful conduct was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

## FIFTH CLAIM FOR RELIEF

**Equal Protection and Selective Enforcement**
***Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiffs' Rights Protected Under the Fourteenth Amendment to the United States Constitution***

210.    Plaintiffs incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

211.    Defendants enforced the Curfew Orders in a malicious and selective manner against Plaintiffs in violation of Plaintiffs' rights to enjoy equal protection of the laws.

212.    Defendants did not enforce the Curfew Orders against others similarly situated.

213.    As a result of Defendants' acts and omissions, Defendants deprived Plaintiffs of their federal, state, and/or other legal rights; caused Plaintiffs bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiffs to expend costs and expenses; and/or otherwise damaged and injured Plaintiffs.

214.    Defendants' unlawful conduct was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

## SIXTH CLAIM FOR RELIEF

### Municipal Liability
**Pursuant to 42 U.S.C. 1983 and _Monell v. Department of Social Services_, 436 U.S. 658 (1978) for Defendants' Violations of Plaintiffs' Rights Under the First, Fourth, and Fourteenth Amendments to the United States Constitution**

215.    Plaintiffs incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

216.    The facts pleaded above describe the policies, practices, and customs Defendants subjected the Plaintiffs to, including, but not limited to: uses of excessive force, and false arrests, and unreasonable restrictions on Plaintiffs' First Amendment-protected conduct, without fair warning; engaging in retaliatory and selective enforcement of the Curfew Orders against Plaintiffs, in the absence of adequately clear standards to guide police officials' extremely broad discretion to arrest anyone at their whim, based on _ad hoc_ determinations as to their perceived violations, without fair warning.

217.    All of the wrongful acts or omissions complained of herein were carried out by the individual named and unnamed police officer defendants pursuant to: (a) formal policies, rules, and procedures of Defendant City; (b) actions and decisions by Defendant City's policymaking agents including, but not limited to, Defendants de Blasio, Shea, Monahan, Hart, and Lehr; (c) customs, practices, and usage of the NYPD that are so widespread and pervasive as to constitute _de facto_ policies accepted, encouraged, condoned, ratified, sanctioned, and/or enforced by Defendant City, Defendants de Blasio, Shea, Monahan, Hart, and Lehr, and other policymaking officials; (d) Defendant City's deliberate indifference to Plaintiffs' rights secured

by the First, Fourth, and Fourteenth Amendments of the United States Constitution, as evidenced

by the City's failures, and the failures of the City's policymaking agents, to train, supervise, and

discipline NYPD officers, despite full knowledge of the officers' wrongful acts, as described

herein.

218.    As a result of Defendants' acts and omissions, Defendants deprived Plaintiffs of

their federal, state, and/or other legal rights; caused Plaintiffs bodily injury, pain, suffering,

psychological and/or emotional injury, and/or humiliation; caused Plaintiffs to expend costs and

expenses; and/or otherwise damaged and injured Plaintiffs.

219.    Defendants' unlawful conduct was willful, malicious, oppressive, and/or reckless,

and was of such a nature that punitive damages should be imposed against them.

## SEVENTH CLAIM FOR RELIEF

**Violations of New York State Law**
***Pursuant to the New York State Constitution and New York State Law***

220.     Plaintiffs incorporates by reference the allegations set forth in all preceding and

following paragraphs as if fully set forth herein.

***Respondeat Superior* Liability**

221.    The conduct of the police officials alleged herein occurred while they were on

duty and/or in and during the course and scope of their duties and functions as police officials,

and/or while they were acting as agents and employees of Defendant City, clothed with and/or

invoking state power and/or authority, and, as a result, Defendant City is liable to the Plaintiffs

pursuant to the state common law doctrine of *respondeat superior*.

**Assault**

222.    Defendants committed assault within the meaning of New York common law against Plaintiffs by intentionally placing Plaintiffs in fear of imminent harmful or offensive contact.

**Battery**

223.    Defendants committed battery within the meaning of New York common law against Plaintiff by intentionally physically contacting Plaintiffs without Plaintiffs' consent.

**New York Civil Rights Law § 79-P**

224.    Prior to their assault, battery, and arrest, certain Plaintiffs identified above had been exercising their rights under New York Civil Rights Law § 79-P, the New Yorker's Right to Monitor Act, to record law enforcement activity and to maintain custody and control over the notes in which they were doing so.

225.    Prior to their assaults, Plaintiffs had not physically interfered with law enforcement activity or engaged in obstruction of governmental administration or other unlawful conduct.

226.    Defendants assaulted and battered and arrested Plaintiffs, intentionally preventing them from further recording law enforcement activity.

**Conversion**

227.    Defendants committed conversion by intentionally taking possession of and/or interfering with Plaintiffs' personal property in derogation of Plaintiffs' rights.

**False Imprisonment and Unreasonable Detention**

228.    By the actions described above, the police officials described above did falsely arrest and/or imprison Plaintiffs within the meaning of New York common law without

reasonable or probable cause, illegally and without a written warrant, and without any right or authority to do so.

229.    Plaintiffs were conscious of the confinement and it was without their consent.

**Negligent Hiring, Training and Supervision**

230.    Upon information and belief, Defendant City supervised, and trained the police officials described above.

**Violations of the New York State Constitution**

231.    Defendants, acting under color of law, violated Plaintiffs' rights pursuant to Article I, §§ 6, 8, 9, 11, and 12 of the New York State Constitution.

232.    A damages remedy here is necessary to effectuate the purposes of Article I, §§ 6, 8, 9, 11, and 12 of the New York State Constitution, and appropriate to ensure full realizations of Plaintiffs' rights under those sections.

233.    As a result of Defendants' acts and omissions, Defendants deprived Plaintiffs of their federal, state, and/or other legal rights; caused Plaintiffs bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiffs to expend costs and expenses; and/or otherwise damaged and injured Plaintiffs.

234.    Defendants' unlawful conduct was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

**DEMAND FOR A JURY TRIAL**

Plaintiffs hereby demand a jury trial of all issues capable of being determined by a jury.

**DEMAND FOR JUDGMENT**

WHEREFORE, Plaintiffs demand judgment against the individual Defendants and the

City of New York as follows:

i.  Actual and punitive damages against the individual Defendants in an amount to be determined at trial;

ii.  Actual damages in an amount to be determined at trial against the City of New York;

iii.  Statutory attorney's fees, disbursements, and costs of the action pursuant to, *inter alia,* 42 U.S.C. §1988, New York Civil Rights Law § 79-P(3)(d), and New York common law;

iv.  A declaratory judgment regarding Defendants' violations of Plaintiffs' rights;

v.  Permanent injunctive relief to prevent future violations of Plaintiffs' rights in the future; and

vi.  Such other relief as the Court deems just and proper.

Dated:  New York, New York
        September 2, 2021

**GIDEON ORION OLIVER**

277 Broadway, Suite 1501
New York, NY  10007
t: 718-783-3682
f: 646-349-2914
Gideon@GideonLaw.com

**COHEN&GREEN P.L.L.C.**

By: 
Elena L. Cohen
J. Remy Green
Jessica Massimi

1639 Centre Street, Suite 216
Ridgewood (Queens), NY 11385
    t: (929) 888-9480
    f: (929) 888-9457
    e: elena@femmelaw.com
       remy@femmelaw.com
       jessica@femmelaw.com

79